**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
WEST PALM BEACH DIVISION

**CASE NO. 13-80685-CIV-HURLEY/HOPKINS**

SANDRA SUNDERLAND, BODIL TVEDE, et al.,

      Plaintiffs,

 v.

BETHESDA   HEALTH, INC. et al.,

      Defendants

---

**PLAINTIFF BARBARA DRUMM'S RESPONSE TO DEFENDANTS' MOTION**
**SUMMARY JUDGMENT AND MEMORANDUM OF LAW**

---

Plaintiff, Barbara Drumm, (referred to hereinafter as "Plaintiff"), by and through undersigned counsel, hereby files her response in opposition to Defendants', Bethesda Health, Inc. and Bethesda Hospital, Inc., et al. (collectively referred to hereinafter as "Defendants" or "Bethesda"), Motion for Summary Judgment and, in support, states as follows:

**INTRODUCTION**

Defendants are a provider of hospital and other medical services by virtue of their ownership and operation of Bethesda Hospital. The Complaint in this matter is brought by Plaintiff and many other persons, all of whom are profoundly deaf and communicate in American Sign Language against Defendants, who provided medical treatment for Plaintiffs or persons associated with them. All of them require qualified interpreters to effectively communicate in the medical setting.(See D.E.52-2, Pltf Neurolinguist, Kegl Report,pgs.30-33). Bethesda is the closest inpatient hospital for all plaintiffs still residing in Boynton Beach, and was for the three patients who have died or moved. Further many of them have been patients on multiple occasions at Bethesda Hospital throughout the last four years. This action has been brought against Defendants for their failure, and pattern and practice of failing, to ensure effective communication through appropriate auxiliary services for persons who are deaf on all occasions stated herein as well

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

as all occasions prior and after these dates. In 2005, as a result of the "Beaubien" case, Bethesda agreed to a protocol for obtaining on-site interpreters, signage and admission forms designed to ensure defendants met their obligations to provide effective communication with deaf patients. In 2011, however defendants obtained a Video remote interpreting system (hereinafter referred to as "VRI"), and stopped using the admission forms to consult with and document the patient's communication needs and requests.1 Thus during the last four years, during the last two almost exclusively, defendants have primarily been using a Video remote interpreting system (hereinafter referred to as "VRI") and only during brief moments of the medical treatment provided, to try to communicate with deaf patients, which has often failed to work effectively. Notwithstanding the constant failures of the VRI system, defendants have failed to obtain on-site interpreters with the exception of one day in one of the plaintiff's hospitalizations; thus during most of the medical treatment there have been few effective auxiliary aids provided which ensure effective communication for deaf patients and their families. When deaf patients request on-site interpreters so they can communicate when the VRI fails, or when they are provided with no accommodation, Bethesda refuses to provide same. In fact Bethesda had gone so far as creating and displaying a sign on the VRI machine which stated that they were using VRI to meet their obligations and if a patient desires or **requests** a live sign language interpreter, the patient will have to pay for one thus in effect barring the patient from asking for a live interpreter.

## LEGAL ARGUMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Further, the evidence must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). It is the

---

1 Although this Court held the Consent Order itself may not be admissible depending on the evidence during trial, plaintiffs do not point to the form to show that defendants did not comply with the Consent but rather to show deliberate indifference as defendant had a form they were using to communicate with deaf patients with regard to their needs and instead began verbally asking this information.

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

moving party's burden to establish that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23(1986). The inquiry which this Court must conduct is

whether the evidence presents a "sufficient disagreement" to require submission to a jury and if finding no issue in dispute, whether the moving party is entitled to a judgment as a matter of law. Anderson, 477 U.S. at 251-52. In this case, there are genuine issues of material facts which preclude judgment as a matter of law.

### POINT I. Defendant Hospital must provide auxiliary aids which ensure effective communication with the Disabled.

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation…" 42 U.S.C. § 12182(a). Congress enacted this statute to "remedy widespread discrimination against disabled individuals." PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001). The ADA guarantees those with disabilities "more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" Baughman v. Walt Disney World Co., 685 F.3d 1131, 1135 (9th Cir.2012) (citation omitted). A violation of Title III can happen when a covered entity fails to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford…accommodations to individuals with disabilities." Forbes v. St. Thomas Univ., Inc., 456 F. App'x 809, 812 (11th Cir. 2012) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

In order to establish a *prima facie* case of discrimination under Title III of the ADA, a plaintiff "generally has the burden of proving: (1) that [he] is an individual with a disability; (2) that defendant is a place of public accommodation; (3) that defendant denied [him] full and equal enjoyment of the goods, services, facilities or privileges offered by defendant (4) on the basis of [his] disability."[2] Schiavo ex rel Schindler v. Schiavo, 358 F.Supp.2d 1161, 1165 (M.D. Fla.2005) (citing Larsen v. Carnival Corp., Inc., 242 F. Supp. 2d 1333, 1342 (S.D. Fla. 2003)).

Elements 1 and 2 are undisputed. Drumm is completely deaf and, therefore, disabled under the ADA. Defendants operate hospitals in the region, including Bethesda Memorial Hospital,

---

[2] Notwithstanding its federal funding requirement, the Rehab Act is interpreted identically to the ADA. Badillo v. Thorpe, 158 Fed. Appx. 208, 214 (11th Cir. 2005) (citation omitted).

which constitute public accommodations.[3] Defendants are further required to take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of *auxiliary aids and services, unless* the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered, or would result in an undue burden. 42 U.S.C. § 12182(b)(2)(A)(iii) (emphasis added). 4

Further the Department of Justice has determined that in certain circumstances, notwithstanding that a family member or friend is able to interpret or is a certified interpreter, "the family member or friend may not be qualified to render the necessary interpretation because of factors such as emotional or personal involvement or considerations of confidentiality that may adversely affect the ability to interpret effectively, accurately, and impartially.  § 56 Fed. Reg. At 35553.  A hospital **cannot** rely upon an adult accompanying a deaf patient to a hospital to interpret or facilitate communication unless it is emergency and they have made attempts but cannot get a qualified interpreter or the deaf person requests this. 28 C.F.R. §303(c)(3).  In addition that it is not difficult to imagine a wide range of communication involving areas such as healthy legal matters and finances that would be sufficiently lengthy or complex enough to require an interpreter for effective communication. (DOJ Analysis at 56 Fed. Reg. At 35567, 35712 and the ADA Title III Technical Assistance Manual written by U.S. Department of Justice, Civil Rights Division Office on the Americans with Disabilities, II 7.1000, Illustration 1, p.36 where an interpreter is likely to be necessary to communicate with patients to communicate with patients about symptoms who must also be able to understand information provided about their conditions and treatment.)

Although the ultimate decision of which auxiliary aid to provide is that of the provider after consultation with disabled person, the medical provider must **ensure** that whatever aid they choose

---

[3] As a recipient of federal monies via Medicare and Medicaid, Defendants are also subject to the Rehab Act. 29 U.S.C. § 794

4 The term "auxiliary aids and services" includes: Qualified interpreters on-site or through VRI services; note takers; real-time computer-aided transcription services; written materials; exchange of written notes…text telephones (TTYs), videophones…or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing. 28 C.F.R. § 36.303(b)(1).  A qualified interpreter means an interpreter who is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. 28 C.F.R. § 36.104.

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

does in fact ensure effective communication. 28 C.F.R. § 36.303. Further in determining what accommodation is necessary, a public accommodation should consult the person with disabilities. (DOJ Analysis at 56 Fed. Reg. at 35567; also see Americans with Disabilities Act Handbook published by EEOC and Department of Justice, Title III - P.81.) The public accommodation is under an absolute duty to ensure effective communication take place while providing benefits, services and treatment and that communication with the disabled is equal to that of communication with the nondisabled. Lastly the cost of the auxiliary aid may not be borne by the disabled person, and nor may the public accommodation retaliate or coerce an individual to deny or limit the benefits or services to which he or she is entitled to under the act. 28 C.F.R. '36.301(c) and 28 C.F.R. '36.206.

### A.      The Rehabilitation Act of 1973

Section 504 of the Rehabilitation Act of 1973 (hereafter referred to as 504) provides: No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . § 29 U.S.C. '794(a) (West Supp.1993).

The Department of Health and Human Services regulations for Section 504 specifically require that the health care provider themselves be prepared to offer a full variety of communication options to the hearing impaired. Under § 504 and the ADA, a hospital has an affirmative obligation to give notice of the options available for effective communication and to make these accommodations whenever necessary in all situations including emergency ones. Section 504 specifically required all applicable agencies to draft regulations to implement the Act. 29 U.S.C.A. §'794 (West Supp.1990) as amended by the Rehabilitation Act Amendments of 1992(see 1992 Cong. Rec.H10714-77(October 2, 1992).

Thus a hospital not only has an affirmative obligation to provide disabled persons the right to participate in services that are equal and as effective as those provided to nondisabled persons, they have an obligation to provide notice of the communication options available, to have a procedure in place for emergency treatment and to provide auxiliary aids which will ensure effective communication.  The fact that a patient may have had effective communication elsewhere

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

such as their doctor's office, does not in absolve the hospital from its duty to ensure effective communication while patients are at their facility. Defendants have violated the law in all of these areas.

### POINT II. Plaintiff's claim for injunctive relief should not be dismissed as she has standing to seek injunctive relief.

As stated above, the plaintiff is a qualified individual with a disability and she alleges that Bethesda Memorial Hospital violated the ADA and the Rehabilitation Act by failing to provide effective communication through the provision of appropriate auxiliary aids. She asserts that this failure resulted in her being denied the opportunity to receive services and benefits equal to those offered to hearing patients because she could not participate meaningfully in her care as she was often left with no ability to communicate due to defendant's failure to ensure effective communication. Plaintiff asserts that the practice of Bethesda Hospital is discriminatory and does not ensure that deaf patients will be able to effectively communicate in their medical treatment. Plaintiff seeks injunctive relief to ensure that this practice does not continue so that she as a deaf individual may receive services from Bethesda with the same rights that all individuals have to communicate, understand and participate in their medical care. Defendants assert that plaintiff does not have standing to seek injunctive relief.

The Supreme Court has developed a three part test for standing. The first prong of the test is the "injury in fact" requirement. The plaintiff must have suffered an injury in fact an invasion of a legally protected interest which is a) concrete and particularized; and b) actual or imminent. Lujan v. Defenders of Wildlife, 112 S.Ct. 2130(1992). Further in City of Los Angeles v. Lyons, 461 U.S. 95(1983) the Court established that a plaintiff seeking injunctive relief premised upon an alleged past wrong must demonstrate a "real and immediate threat" of repeated future harm to satisfy the injury in fact prong of the standing test.  Also see McCullum v. Orlando Regional Healthcare System, Inc., 786 F.3d 1135 (11th Cir. 2014).

Defendant relies heavily on the McCullum case to support their position that Ms. Drumm does not have standing for injunctive relief. However the McCullum case is easily distinguishable from the instant case. McCullum involved a fourteen year old boy, who all agree never requested an interpreter despite signs and handouts "soliciting a patient's communication methods". Further

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

there was no evidence that the hospital would discriminate in the future. Further plaintiff who suffered from Crohn's disease could "point to no present issues that could result in a need for emergency care" as his intestines had been removed which were the basis of his issues, nor any records that listed his Crohn's as a "chronic condition". Lastly plaintiff had not been hospitalized at all in the four years since the hospitalization at issue. See McCullum, supra and Case No: 6:11-cv-13887-Orl-31GJK.

Drumm is a eighty year old woman who has "hypertension, diverticulosis of large intestine, HTN with renal disease, **chronic** kidney disease, stage II.(Def. Ex.1) Any and all of her very serious conditions which include chronic kidney disease in addition to her age present a very real imminent risk of hospitalization at Bethesda at any time and all require regular monitoring. The likelihood of returning for current conditions is sufficient for standing for a hospital. See Connors v. W. Orange Healthcare Dist., 2005 U.S. Dist. LEXIS 47223, *16, 2005 WL 1944593 (M.D. Fla. Aug. 15, 2005)

Defendant's argument in the instant case is basically stating the plaintiff's claims for injunctive relief is moot at this point. To say that a case has become moot by the end of the offending behavior means that the defendant is entitled to a dismissal of that claim as a matter of right. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement. United States v. W.T. Grant Co., 345 U.S. 629, 632(1953).The party asserting mootness has a "heavy burden" of persuading the court that the challenged conduct cannot reasonably be expected to start up again". Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC) Inc. 528 U.S. 167, 189,190(2000). Further a long history of violations would cut against a finding of mootness. See Sec'y of Labor v. Burger King Corp., 955 F.2d 691(11th Cir. 1992) "five year history of violations such as in the instant case, cut across this finding of mootness. In fact, the constant problems as well as the assertion that the defendant's malfunctions are permissible militate against any mootness finding. Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1187-88 (11th Cir. 2007). The ten plaintiffs in this case are all between the ages of sixty nine and ninety one. Like most individuals of their ages, they have chronic medical conditions which could result in their admission to Bethesda anytime. The concept of capable of repetition yet evading review has also been often used when a person with a disability has been subject to the same harm

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

on multiple occasions. See Olmstead v. L. C. by Zimring, 527 U.S. 581, 594 n.6, 119 S.Ct. 2176, 2184 (1999) ("[I]n view of the multiple institutional placements L. C. and E. W. have experienced, the controversy they brought to court is "capable of repetition, yet evading review."); or even when subject to once incident that is transitory that will not reoccur see, e.g.  Enyart v. Nat'l Conf. of Bar Exam'rs, Inc., 630 F.3d 1153, 1159 (9th Cir. 2011)(accommodations for the MPRE exam); Ass'n for Disabled Americans v. Reinfeld Anderson Family Ltd. Prt., 2015 U.S. Dist. LEXIS 52172 (S.D. Fla. Apr. 21, 2015)(plaintiff did not lose standing because of doctors decision to terminate the physician-patient relationship).

This standing for injunctive relief has been tested in cases involving deaf individuals and claims they filed for failure to provide accommodations for their disabilities. In Tugg v. Towey, a case in the Southern District of Florida, individuals who were deaf who received mental health counseling in the past, as well as hearing members of their families, were found to have standing for preliminary injunctive relief, based upon the state department of rehabilitative services' past history of discrimination and the fact that it was likely to happen again. 864 F. Supp.1201 (SDFla.1994). Further in a case where the plaintiff never actually visited the defendant doctor but was told an interpreter would not be provided for an office visit, her claim for injunctive relief was upheld. Majocha v. Turner, 166 F.Supp.2d 316 (W.D.Pa 2001). In Majocha, Id, the District Court in the W.D. of Pennsylvania determined that the plaintiff had standing where a public accommodation in the health care field adheres to its policies of refusing to provide the requested auxiliary aid even if there was no specific evidence that the plaintiff would return to use that facility. Also see Mayberry v. Von Valtier, 843 F.Supp. 1160(E.D Mich. 1994) and Dudley, supra.

In a case strikingly similar to this case, the Maryland District Court found the deaf plaintiffs had standing to seek injunctive relief because they, like plaintiffs in this case, alleged it was the defendant's "policies, pattern and practice" which they were injured by. Gillespie v. Dimensions Health Corporation, 369 F. Supp.2d 636 (D. Md. 2005). In doing so the court carefully distinguished the case before it from other cases where injunctive relief has been denied by stating that the defendant's failure to accommodate the multiple plaintiffs in the past on numerous occasions made it more likely that the plaintiffs would be harmed again "if and when" they returned to the defendant facility when defendant adheres to a practice or policy that in and of

itself is discriminatory. The <u>Gillespie</u> case involved seven deaf individuals who had sought and received care from a local hospital. They alleged that they required qualified interpreters to communicate effectively in medical situations and that despite their repeated requests for live interpreter services they were forced to try to lip read, communicate through cryptic notes or use a Video Remote Interpreting System which proved to be an insufficient mode of communication. The plaintiffs as in the instant case all alleged they requested a live in person sign language interpreter to communicate effectively with the hospital staff after the VRI system did not work effectively and that all of their requests were unfulfilled. Again as in the instant case, the plaintiffs alleged  instead they were forced to use this VRI system which was ineffective either because the staff was unable to operate the system because they were inadequately trained or they were unable to understand the interpreter due to poor quality of the video transmission or both.

In that case as in the instant case plaintiffs alleged as the plaintiffs do in the instant case that it was this hospital's practice and pattern not to provide live in person qualified sign language interpreters but rather to resort to "occasional and sporadic note taking and a VRI device which was ineffective. Thus the Court found it was likely that plaintiffs would be harmed again if and when they returned to that hospital." <u>Id</u> at 643.  Therefore the Court stated "<u>given the proximity of their residences to (Laurel Regional), their strikingly common past experiences with the hospital and the fact that they seek to enjoin what they allege is an unlawful policy, **pattern and practice**, the court concludes that (the plaintiffs who continued to reside in the area) had sufficiently alleged a real and immediate threat of future injury at the hands of Defendant and thus had standing for injunctive relief.</u>" <u>Id.</u> at 645. Also see <u>Crow et al v. Flagler</u> <u>Health Care System</u>, (Case 3:12-cv 01088) M.D.Fla 2014, wherein the Court also denied defendant hospital's motion to dismiss multiple deaf plaintiffs' claims for injunctive relief.  The hospital alleged it had a policy and had provided VRI or on-site interpreters when necessary yet the plaintiffs alleged as in this case that the hospital failed to follow its policy and that the VRI was ineffective.(D.E.68-14 ).

The plain language of Title III of the ADA articulates that future events are covered by 42 U.S.C. §12188(a).  Title III provides for injunctive relief to "any person who is being subjected to discrimination on the basis of disability or who has "reasonable ground for believing that such person is about to be subjected to discrimination". See 42 U.S.C. 12188(a)(1). Further, the

language of the ADA is broad enough to provide a private right of action for an individual who suffered a single incident of discrimination if the plaintiff is aware that the discrimination is ongoing.[5] Bethesda is a provider and it is the closest inpatient facility to Drumm's home. The fact that JFK now has a satellite Emergency Room only is not the same as an inpatient hospital facility. All patients of JFK Emergency Room who require inpatient hospitalization as Sunderland has three times in two years, are transferred to JFK's Medical Center which is further than Bethesda Hospital.  The idea that because JFK has set up a satellite Emergency Room, Bethesda is not obligated to provide appropriate auxiliary aids as plaintiff can be forced to go to another facility is anathema to the entire purpose of the ADA.

Although Bethesda Hospital claims to have an adequate policy, it is apparent based upon the facts of the instant case and all of the experiences of the plaintiffs, the sign Bethesda placed on its VRI machine, the statements made by the past president of Bethesda with regard to the VRI to the FAD and those made by Gary Ritson, their current Risk Manager in charge of providing accommodations to deaf patients, (as detailed in section on Deliberate indifference below), their deliberate choice to stop utilizing a form created to ensure deaf people would be able to communicate their needs, their actions with regard to the birth of Margaret Weiss's child in July and the failure of the VRI for the Katzs' and their failure to get an onsite interpreter, as recently as a few months ago, that what they have in effect is an absolute practice to utilize only VRI regardless of whether it is effective or not and only when they decide to use it.  The VRI system in use by Bethesda does not ensure effective communication with deaf patients. It is often blurry, freezing, and inoperable or the staff does not know how to use it.  The VRI logs are replete with calls of less than five minutes as the staff attempts to connect, only to be disconnected.(D.E. 67-4,5,6).The medical records show many days where there is simply no usage of the VRI system and records which show reliance upon writing or family members which is most often very limited, rather than using the VRI.  Yet requests by deaf patients for on-site interpreters when they cannot communicate effectively through the VRI are refused, as Bethesda's practice is to use VRI or nothing. Indeed after the implementation of the VRI system at Bethesda only a handful of on-site interpreters have been called and only if the machine does not turn on at all, never if it was blurry,

---

[5] No person with a disability shall be required to engage in a futile gesture if such person has actual notice that a person or an organization does not intend to comply with the ADA. 42 U.S.C. § 12188 (a)(1).

freezing, pausing or lagging as 28 C.F.R. 303(f) requires or because there was a determination that the nature, significance and/or complexity of the situation required it, as 28 C.F.R. 303(c) requires.6. This "one size fits all" policy and failure to follow the Department of Justice regulations is a clear violation of the ADA and 504. See D.E. 52-2, Kegl report, pg.13-18,30-33 for an in depth analysis from a neurolinguistics point of view about the VRI and Bethesda's use of VRI.

Under these circumstances then there is a "real concrete threat" that plaintiff Drumm will once again be under defendants' care and that defendants will once again discriminate against her. For the foregoing reasons, defendants' motion to dismiss plaintiff's claim for injunctive relief should be denied.

**Point III. <u>Plaintiff Drumm can establish a prima facie of Discrimination under the Rehabilitation Act and thus a claim for compensatory damages.</u>**

Defendants correctly cite the applicable law in this case, but incorrectly applies it to the facts of this case. As stated by defendants, the applicable case law requires that Plaintiffs must show a lack of effective communication and the disregard of the rights and feelings of the disabled or "deliberate indifference" in order to establish a prima facie case for damages under the Rehabilitation Act. Further it is true that a failure to provide an interpreter by itself on request is not <u>necessarily</u> deliberate indifference. Defendants' contention here then is that plaintiff cannot show this lack of effective communication and deliberate indifference and that plaintiff's claim is based upon defendants' failure to provide an onsite interpreter just because she requested it. However a review of the record in this case clearly reveals these contentions are incorrect and that this case is easily distinguishable from the record in <u>McCullum,</u> <u>supra</u>, <u>Martin v. Halifax Healthcare Sys. Inc.,</u> 2015 WL 451796(11th Cir. 2015), and <u>Silva and Jebian v. Baptist Health South Florida</u>, et al, Case No: 14-CV21803-Williams.

The record here which is comprised of medical records, documentary evidence, deposition transcripts and certifications is replete with references to both communication difficulties and deliberate indifference. Plaintiff's claim is not based upon the fact that defendant did not provide an interpreter upon her request but that defendant failed to ensure effective communication by their

---

6 Yet a live interpreter can be obtained in less than one hour and NIR ( the interpreting agency Bethesda is supposed to use for an on-site sign language interpreter) has been able to fill the hundreds of requests for hospital interpreters for the past 4 years.

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

pattern and practice of using only VRI even when it did not work properly or providing nothing and not consulting with her to determine what was required to meet her communication needs. Under the facts of the instant case, plaintiff can easily establish all of the elements of a prima facie case of discrimination as stated in Liese v. Indian River County Hospital District, 701 F.3d 334, 342 (11th Cir. 2012).

## A. Evidence of Ineffective Communication

"The task of determining whether an entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently fact-intensive". See, e.g., Chisolm v. McManimon, 275 F.3d 315, 327 (3d Cir.2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."); Randolph v. Rodgers, 170 F.3d 850, 859 (8th Cir.1999) (finding that whether a sign language interpreter was required under the RA is a question of fact inappropriate for summary judgment); Duffy v. Riveland, 98 F.3d 447, 454–56 (9th Cir.1996(concluding that whether qualified sign language interpreter was required under the Americans with Disabilities Act of 1990 is a question of fact inappropriate for summary judgment). Liese at 342-343.  In acknowledging this in Liese, the 11th Circuit wanted to clarify however that this did not mean that every request for an auxiliary aid precludes summary judgment.

> "Whether a particular aid is effective in affording a patient an equal opportunity to benefit from medical treatment depends largely upon context, including, principally, the nature, significance, and complexity of the treatment. For example, emergency surgery is often a complicated concept to convey to a person who can hear well; the attendant risks, manner of surgery, prognosis, and advantages or disadvantages of *immediate* or postponed surgery can only complicate this communicative task. Thus, under circumstances in which a patient must decide whether to undergo *immediate* surgery involving the removal of an organ under a general anesthetic, understanding the necessity, risks, and procedures surrounding the surgery is paramount. Under these circumstances, auxiliary aids limited to written notes, body gestures, and lip reading may be ineffective in ensuring that a hearing-impaired patient receives equal opportunity to benefit from the treatment".

Liese at 343.

Defendants initially cite the case of Silva and Jebian v. Baptist Health South Florida, et al, Case No: 24-CV21803 a trial court decision, which is not precedential and plaintiffs submit was

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

wrongly decided, in support of their motion.  The Court in Silva, supra,  is incorrect in  using the fact that "there was no specific evidence demonstrating that the plaintiff was misdiagnosed, was given wrong medical treatment" as support for its decision to grant summary judgment. These are **not** medical malpractice cases, and the fact that the actual care and treatment that was provided was not discriminatory or unequal is not dispositive. Aikins v. Saint Helena Hosp.  843 F. Supp.1329, 1338(N.D. Ca. 1994) The Court also erroneously held that a deaf person needed to explain what it was they did not understand and if they could not do so, their  statements of not understanding their medical care were conclusory. This standard is not supported by the case law and requires the plaintiff to explain what they could not hear or understand.  Further the court failed to construe the allegations of the plaintiffs in the most favorable light as the nonmoving parties, instead accepting what movants stated as the true facts.  The focus must instead be on whether or not defendant ensured effective communication and plaintiff had the ability to meaningfully understand and participate in her medical care and this should be viewed in the most favorable light to the plaintiff. Liese, supra. In Alumni Cruises, LLC v. Carnival Corp., 987 F. Supp. 2d 1290, 1304 (S.D. Fla. 2013), Judge Rosenbaum defined "equal" as defined by the ADA as follows:

> [T]he Court is mindful that the ADA guarantees those with disabilities "more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" Thus, for public accommodations to fulfill the promise of the ADA, they "must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience."

Id. (internal citations omitted).  Full and equal enjoyment extends to more than avoidance of medical negligence.  Further the instant case involves ten plaintiffs and the FAD, whose allegations are supported by a full record of documents, depositions, certifications, a sign, an onsite inspection and repeated actions which support a finding of a pattern and practice of deliberate indifference and discrimination.

Defendants also cite Martin v. Halifax Healthcare Systems, 2015 WL 451796 (11ᵗʰCir. 2015), to state that general statements without specific evidence of ineffective communication is not sufficient to defeat a motion for summary judgment.  The issue in Martin was that plaintiffs

had not cited "particular parts" of the depositions to support their opposition to summary judgment nor did they include any assertion in their declarations of communication barriers. Further unlike in the instant case, the hospital tried to call for a live interpreter as soon as plaintiff D'Ambrosio was admitted for a coronary event but cancelled the live interpreter and used VRI as it was an emergency. They however obtained live interpreters subsequently for him. Plaintiff Gervarzes refused to use the VRI during her grandchild's birth and the hospital then immediately arranged for a live interpreter and provided them at different points of the remainder of the stay. Plaintiff Martin provided no declaration, deposition testimony or expert testimony that he requested an interpreter for his emergency room visit, or that he had problems understanding English. In this case by contrast the plaintiffs all testified that they asked for interpreters, there are not voluminous notes revealing effective communication and we have an expert opinion that the reading levels for all plaintiffs is in the 4th to 5th grade reading level except Sunderland which is even lower. D.E. 52-2,p.30. The Court in Halifax  did not have expert testimony and deposition or medical record citations and stated that plaintiffs' claims were based upon the fact that they claimed the hospital should have provided live interpreters during the entirety of their medical treatment and that the law does not require this. That is why summary judgment was granted in that case.

It is against that backdrop and the cases that followed Liese in the 11th Circuit, McCullum and Martin, which are distinguishable from the instant case that this case is before this Court. Barbara Drumm was admitted to Bethesda on February 25, 2012 through February 28, 2012 for back pain and possible heart problems. Despite her and her daughter's requests for an interpreter no accommodation was provided at all during the first two days. It is noted in the medical records that "not much information can be obtained" and that she was "difficult to assess due to poor patient cooperation"(apparently her failure to be able to communicate was interpreted as poor cooperation). On the second day of her admission, Bethesda apparently thought it was good to use her deaf friend to try to communicate with her, "Friend translated in sign lang.", apparently with no concern about effectiveness or HPPA regulations. The Patient's daughter called to ask them to provide a communication method" but still no interpreter or effective method was provided. Drumm stated "it was very frustrating. I needed to know what's going on. For communication it just wasn't there. Nobody was telling me what was the matter with me. That time came for the stress test; they sent me upstairs. I tried to ask what was going on. They just moved on with what

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

was happening. We went up, and I didn't know what the reasoning was". "I wrote to them, why am I here". (See Ex. A, Excerpts from pltfs medical records, Def.Ex.22, Pltf. Dep. T38:1-9.14-25).

On the third day February 27, after plaintiff's daughter complained, a VRI machine was finally brought on, but it did not connect successfully. The VRI logs only show one 4 min call. (D.E. 67-4,5).  The records note that the patient said she did not understand. Dr. Jaffe, her doctor stated he communicated with her through her visitor on that day (once again a deaf visitor). Yet when told this the following day when Drumm inquired through a hearing visitor when she was going home, Drumm said "she needed to see her Dr. to know her diagnosis" and "what is going on". Drumm explained that her visitor was deaf so there was "no possible way the visitor could have interpreted for Dr. Jaffe".  Dr. Jaffe refused to come back as he stated he came to see the patient yesterday and used her friend to interpret. On this day the hospital once again utilized Drumm's friend (this time hearing) to try to communicate with her. The records show "auditory barriers to learning, and that she was "taught through other, accompanied by her friend.  Drumm was then left with no idea of what had occurred in the hospital, what her diagnosis or prognosis was (See Ex. A, Med records and SOF).

During her next hospitalization 4/30/13 through 5/1/13 for chest pain, there are repeated short VRI calls as apparently it was not working. Dr. Styperek, the cardiologist wrote to Dr. Deitsch, the hospitalist "in this patient with mutism and deafness, it is very difficult to clearly delineate what is what", "I will consider her for cardiac catheterization if somebody can explain to her benefits and pitfalls of why we are doing that".  The next day Drumm was discharged without the cardiac catheterization and the records are unclear as to why. Based upon Dr. Styperek's comments, it can be assumed, doctors would not accept responsibility for a patient they could not communicate with. Yet although Dr. Deitsch clearly had the ability to obtain an interpreter as the hospital doctor, there is no notation that he arranged same and that Dr. Styperek was able to explain anything to her, to at least consider her for cardiac catheterization. This occurred although, Bethesda itself has recognized the need for an interpreter during events such as determination of a patient's medical history, provision of patient's rights, permission for treatment, diagnosis, explanation of procedures, treatment, explanation of medications, and or therapies as delineated in the Consent Judgment they entered into in <u>Beaubien v. Bethesda Hospital</u>, Case 9:13-

cv-80685-KLR DE. 5-1 page 4. 1. There is also no indication at all in the medical records that the staff provided notice of communication options and consulted with the plaintiff or her husband to document their communication needs.

Contrary to defendants' assertions, Plaintiff states that she did understand much of what went on during her medical treatment, what treatment was to be performed, and was often unaware of her diagnosis and prognosis because of defendant's failure to ensure effective communication with her.

### Evidence of Deliberate Indifference

Defendant contends that there is no evidence that "anyone, let alone an official" at Bethesda was aware that they were not providing effective communication, knew an onsite interpreter was required for effective communication and deliberately chose not to provide an onsite interpreter. (See Def. Brief Pg.16). The records as indicated above are replete with notations of difficulties with communication and the use of "visitors" (deaf and hearing) as interpreters. The VRI logs show either no calls at all or very short calls during her admission in February and in April the records clearly show that the cardiologist was unable to properly assess Drumm due to her deafness and his inability to communicate with her. Once again, despite defendants' assertions that an onsite interpreter is called when the VRI does not work, there was no effort to get a live interpreter in either of those hospitalizations. These records show then that despite their policy that states if there is a problem with VRI they will get an onsite interpreter, they deliberately chose not to obtain one. Further, there are the many notations in the record clearly showing important communications such as diagnosis, prognosis, prescription of medicines, tests that were all done without an interpreter despite the fact that these are all situations Bethesda itself recognizes, requires an interpreter. In the Department of Justice's recent resolution agreement with St. Francis Medical Center, these situations are all listed as situations which the DOJ has determined require an interpreter. (See Resolution Agreement between USA and St.Francis attached as Exhibit H, ¶30.9).

Defendants' argument centers on how they interpret the term "official" and ignores the deposition transcripts, medical records and all notations to problems in communication. In doing so, defendants point to the testimony of Dorothy Kerr, one nurse who stated that she did not have the authority to call for an on-site interpreter, but that she would have to get authority from the Administrator on Call. Defendant also cited the testimony of Gary Ritson, the person who was in

charge of accommodations for the disabled and the policy of Bethesda who stated that he was unaware of any problems or complaints, other than at the beginning of their use of the VRI to evidence that therefore no "official" knew of the problems. Defendants also point to their policy to show that they have a policy in place. Defendants allege then that plaintiffs cannot show deliberate indifference. Defendants' argument is flawed for many reasons as is revealed by a close reading of the testimony of Gary Ritson, the report of defendants' expert, the medical records, the testimony of several witnesses, the VRI logs, the sign they created and the entire record.

The determination as to who is an "official" is a "fact intensive inquiry since an official's role may vary from organization to organization". In <u>Liese</u> the 11th Circuit held a doctor was an official. <u>Liese</u>,350, 351. In both <u>McCullum</u> and <u>Halifax,</u> the 11th Circuit made clear that officials are "hospital <u>staff</u>" in this type of circumstance. <u>McCullum</u>, 47-48, <u>Halifax</u>, 23. Thus we must look at the true practice and policy in Bethesda to make this determination. In reviewing the evidence in this case, a clear pattern and practice of discrimination emerges.

Gary Ritson has been the risk manager of Bethesda hospital for thirty eight years. (See D.E. 235-5, Gary Ritson Dep. T6:7-11). He was the Bethesda official who worked closely with defense counsel in prior litigation involving a deaf patient, "Beaubien" (T24:2-19-25:4). He was the person responsible for ensuring the accommodations policy is adhered to (T77:24-78:10). He was also the person whom the staff was to contact if they were having a problem with the VRI or if deaf patients had language service complaints they made to nursing (T78:4-10, T78:21-33). However he has never seen the VRI being used with a deaf patient or investigated a complaint even when deaf people allegedly refused to look at the VRI.(T96:18-21). He stated in his deposition that he relies upon the nurse's judgment to determine if the VRI is working or not. (T104:19-25). Defendants' expert Timothy Hawkins, confirms this when he explains "the clinical staff perform an analysis of each patient to determine what method of communication is necessary and they are free to utilize the VRI or to request an on-site live interpreter if **they** feel that option is necessary. <u>The administration leaves the decision making to the clinical staff</u> either in the Emergency Room or any of the nursing units throughout the hospital to decide if the VRI system is adequate or they need to bring in a live interpreter."(See Ex. C, Def. Exp. Rpt. Timothy Hawkins, Pg.7). It is clear then that the clinical staff (including the nurses) are the "officials" at Bethesda whose judgment is relied upon to determine what accommodations are necessary and who must

take steps to ensure that those accommodations are obtained. They are the only ones the deaf patient who has problems with communication, encounters and therefore the only ones they would be able to indicate a problem to. Indeed Bethesda's policy dictates that the nurse is the one who is notified by the patient and she/he must then take action. Yet as in Liese, Bethesda's policy provides "no guidance or recommendation as to when doctors or nurses should use these aids and gives them complete discretion in this matters". Liese at 350.  Here the nursing staff, Dr. Deitsch, Dr. Jaffe and Dr. Styperek were clearly aware that there were problems communication. (Drs.in and of themselves are "officials.")Liese Yet no clinical staff member did anything further except note the problems.

Bethesda's deliberate indifference to the rights and feelings of the deaf community is apparent throughout the record here. June McMahon, President of the FAD, met with the Past President of Bethesda, Robert Hill, in 2011, to notify and discuss the problems the deaf community was having as the VRI system they were using was not working properly and the staff was not trained, and was told they would continue to use VRI only.(See D.E..68-11, June McMahonCert,D.E.68.9, Dep. Caroline Partin, T11:23-14:14, 18:25-:21:4, specifically T20:17-19). In the 2006 Beaubien Consent Judgment, Bethesda agreed to utilize an admission form created to ensure that Bethesda would consult with deaf persons about their communication needs in a way that they could access and understand. The form is a written form which has pictures of signs and/or universal logos as many deaf individuals have limited ability to read and write English, See Kegl Rpt D.E68-12. , Pg. 26) and the deaf person merely had to check what they required for communication. (See Ex. G). The form was created as a means of identifying from the patient their best way of communication.(D.E. 235-5,Ritson Dep.T:35:2-39:13). Thereafter despite the consent and most importantly the fact that deaf people cannot hear and often cannot communicate verbally which was the entire reason for the creation of the form, the hospital **deliberately chose** to stop using this form and to ask these questions about communication needs "verbally". This was after two complaints were brought against them by deaf patients both in the Federal court and through the Department of Justice.

As Mr. Ritson confirmed, Bethesda basically has a blanket practice to use VRI only and will only provide an on-site interpreter if the VRI is not working at all. (D.E. 235-5, Ritson Dep. T115:15-25)  They do not give consideration to the "nature, significance or complexity of the

treatment" in violation of 28 C.F.R.303(c).  As Mr. Ritson stated, the only circumstance or situation where VRI is not appropriate is when the deaf patient is blind.(Ex. Ritson Dep.  T64:16-23)   This could not be more clearly demonstrated then by their actions in the Weiss et al. v. Bethesda et al. case currently before this court when despite repeated requests and a motion for preliminary injunction they repeatedly refused a deaf woman's request for an on- site interpreter for childbirth.  Bethesda also specifically created a sign which Mr. Ritson directed be placed on the VRI which stated that they use VRI and if a deaf person "requested or desired" a live sign language interpreter they would have to pay for the interpreter themselves in violation of 28 C.F.R. 301(c). In addition in each of the medical records of Sunderland, Donofrio, Drumm, and Gluckman the staff noted that the VRI was not working properly, yet no live interpreter was called as their "policy" dictates.(See Exs. of Sunderland, Donofrio, Drumm, Gluckman anyone else whose records show vri not working and no interpreter brought in). This policy of VRI or nothing, even if it is not working properly was again the experience of June McMahon, Maurice Katz and Margaret Weiss as recently as a few months ago, despite the fact that plaintiffs' expert had noted that the VRI did not work properly in five out of six locations in the hospital a few months earlier. See Ex. B, Weiss Decls and records during birth, Ex. B, Cert. of June McMahon, Ex. E, VRI Work Orders of Katz, D.E.68-13 Scott, Pltf. VRI Expert Decl. All of this in addition to the  choice Bethesda has made to stop using a form they agreed to use which obviously helped deaf people communicate their needs and to instead only ask questions verbally to deaf people all overwhelmingly shows the deliberate indifference that Bethesda has for the rights and feelings of its deaf patients.

Plaintiff and plaintiffs' claims in the instant case are not based upon Bethesda's failure to provide a live interpreter when requested, but instead upon their failure to ensure effective communication with her and them as a result of a pattern and practice of deliberate indifference and discrimination. Bethesda has had two prior complaints against them and the past president of the FAD brought the issues related to the VRI system Bethesda uses, to their attention, over four years ago. Yet they continue to use VRI only almost exclusively or nothing, and have purposefully stopped consulting with deaf patients in a way that is effective to determine what may be needed for effective communication. This then is the true pattern and practice of Bethesda and what clearly distinguishes this case from McCullum, Martin and Silva. In the instant case, the record before

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

this Court, reveals there are many genuine issues of material fact which preclude summary judgment.

For the foregoing reasons, plaintiffs respectfully request that defendants' motion for summary judgment be denied in its entirety.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 23rd day of December, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served via CM/ECF on this day to:  John D. Heffling, Esquire, Sonneborn Rutter & Cooney, P.A., 1400 Centrepark Boulevard, Suite 400, West Palm Beach, Florida 33401.

DISABILITY INDEPENDENCE GROUP, INC.
2990 Southwest 35th Avenue
Miami, Florida 33133
Telephone: (305) 669-2822
Facsimile: (305) 442-4181
rgoldstein@justdigit.org

BY: <u>s/ *Rachel L. Goldstein*</u>
    Matthew W. Dietz, Esq.
    Fla. Bar No.: 0084905
    Rachel L. Goldstein, Esq.
    Fla. Bar No.: 0095973
    *Attorneys for Plaintiffs*

    <u>/s/ Clara R. Smit, Esq.</u>
    Clara R. Smit, Esq.
    *Attorney for Plaintiffs*

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*