**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-80685-CIV-HURLEY**

**SANDRA SUNDERLAND et al.,**
　　　**Plaintiffs,**

**vs.**

**BETHESDA HEALTH, INC. et al.,**
　　　**Defendants.**
_____/

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
**AS TO PLAINTIFFS SANDRA SUNDERLAND, BARBARA DRUMM &**
**CAROLANN DONOFRIO [ECF Nos. 235, 223, 241]**

　　**THIS CAUSE** is before the Court on the Defendants' motions for summary judgment as to the disability claims of Plaintiffs Sandra Sunderland, Barbara Drumm and Carolann Donofrio arising under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act of 1973 (the "Rehabilitation Act"). Having carefully reviewed the evidentiary record and considered the parties' arguments and relevant legal authorities, and having had the benefit of oral argument, the Court has determined to grant the Defendants' motions for summary judgment for reasons more particularly expressed below.

## I. BACKGROUND

### A. Factual Background

　　Defendant Bethesda Hospital, Inc., and Bethesda Health, Inc. (cumulatively "Bethesda") own and operate Bethesda Memorial Hospital ("Bethesda Memorial") and Bethesda Hospital West ("Bethesda West"), both located in Boynton Beach, Florida. The three individual plaintiffs are deaf persons who communicate primarily through the use of American Sign Language ("ASL") and who were treated at Bethesda Memorial on various dates between 2012 and 2013.

1

All plaintiffs allege that they requested live, on-site ASL interpreting services at some point during their interaction with hospital staff at this facility, but that the hospital failed to honor their requests. Plaintiffs contend this failure deprived them of effective communication with hospital staff in violation of their rights under the ADA and the Rehabilitation Act.

Bethesda maintains a policy governing communication with its hearing-impaired patients, "Operations Regulation 1118," eff. December 28, 1990, last updated on January 18, 2012.  This policy, effective during the hospital admission of each of the above-named plaintiffs, provides at Section IV.C., "Procedure - Hearing Impaired:"

> For the purpose of rendering emergency health care, the Hospital provides telecommunication devices including a Teletypewriter (TTY) and a Video Remote Interpreting (VRI) Computer on Wheels. The Teletypewriter (TTY) unit is stored in the Communication Department for all areas to access to aid communication with patients or the next of kin who will be making health care decisions for the patient with impaired sensory, manual or speaking skills.  The Video Remote Interpreting (VRI) computer is stored in the Nursing Supervisor's office and will be brought to the area requesting the unit by the Nursing Supervisor.  When finished with the Teletypewriter (TTY) and/or the Video Remote Interpreting (VRI) computer, the TTY must be returned to Communications and the Video Remote Computer to the Nursing Supervisor's office.

> In those circumstances where VRI does not accommodate patient need the nursing administrative supervisor and or risk management will be contacted to assist with providing an alternative communication mode such as via Nationwide Interpreter Resource Inc. (561-715-2346).

> The Human Resource department shall maintain a list of employees with documentation of competency to interpret using sign language.  These employees shall be available during their shift to assist in the communication and interpreting with patients and visitors when VRI does not accommodate patient need.

[DE 235-4, p. 4].

Gary Ritson, Bethesda's former Vice-President for Risk Management, was at all material times the person responsible for ensuring compliance with Bethesda's accommodations policy

for hearing-impaired persons. He testified that Bethesda routinely relies on VRI as an auxiliary aid for all foreign languages [DE 235-5, p. 16], except in instances when it is not functional, in which case a live, on-site interpreter is called [DE 241-28, pp. 6-8].

With regard to deaf patients, VRI involves use of a live ASL interpreter to facilitate communication with the patient via mobile video equipment. If a Bethesda patient expresses a preference for communicating through a live interpreter, his or her bedside clinician is responsible for initiating a request for VRI from the nursing supervisor [DE 235-5, p. 18]. The bedside nurses are entrusted with responsibility to determine the need for VRI services, and the hospital relies on their judgment to determine functionality of the VRI machines when they are used. If the machines are not operational, technical staff may be brought in to assist; if the problem cannot be corrected, the nursing supervisor must contact the "Administrator on Call" or Risk Manager for authority to hire a live, on-site interpreter [ECF 235-25]. Ritson was never personally involved in a situation where VRI was not functioning, but was aware of instances where there were technical problems, requiring use of an on-site interpreter [ECF 235-25].

Dorothy Kerr, Bethesda's nursing supervisor, testified that the policy at Bethesda governing use of VRI technology allows any staff person to request the VRI from the nursing supervisor, and that, upon such request, she as nursing supervisor was responsible for delivering the VRI to the patient's room [DE 235-26, p. 8]. Kerr recalled only two occasions where she needed to obtain on-site ASL interpreters for hearing impaired patients due to VRI malfunctioning issues [ECF 235-26, p. 13]; in both instances, pursuant to hospital policy, Kerr was required to obtain authorization for ordering an on-site interpreter from the "Administrator on Call" [ECF 235-26, p. 18]. Other than these two incidents where VRI malfunctioning necessitated the use of on-site

interpreters, Kerr was unaware of any complaints about VRI performance issues from patients or staff [ECF 235-26, p. 19].

## 1.  Sandra Sunderland

Plaintiff Sandra Sunderland is a sixty-nine year old woman residing in Boynton Beach, Florida. On October 28, 2012, she suffered a heart attack and was admitted to the Bethesda Memorial emergency room.  She was given nitroglycerin and placed on EKG monitoring.  On October 29, 2012, she underwent a cardiac catheterization, ordered by her cardiologist, Dr. Von Sohsten, and performed by Dr. Gustave Cardenas (selected by Dr. Von Sohsten).

Dr. Sohsten's initial consultation note describes Ms. Sunderland's medical history as significant for hypertension, hypothyroidism and deafness.  Under "review of symptoms," he notes, "Difficult to obtain due to her deafness, but apparently she denies heart failure symptoms, palpitations, syncope, stroke, bleeding or claudication.  She does not have any pending surgeries (this was also obtained from her son)" [ECF 235-15, p. 2].

Dr. Cardenas testified that he met beforehand with Ms. Sunderland and her thirty-year-old son, Brad Sunderland, to explain the procedure and believed he was able to effectively communicate with Ms. Sunderland without an interpreter. He never advised anyone in the hospital administration that he needed an interpreter, and said that he performed the procedure only after Ms. Sunderland provided her informed consent.

Although a signed consent form dated October 29, 2012 bearing Ms. Sunderland's signature is included in the hospital chart [ECF 235-17], Ms. Sunderland denies that Dr. Cardenas explained the procedure to her before it was performed.  Indeed, when her nurse told her Dr. Cardenas wanted her to have a catheterization, she was "shocked," at which point she asked the nurse for an interpreter, but the nurse said "no" [ECF 235-19, p. 2].

Ms. Sunderland contends Dr. Cardenas never explained anything directly to her beforehand; instead, she says that she was lying down in another room, "scared to death," while her son talked to the doctor. When her nurse told her to calm down, Ms. Sunderland said, "I was like, "Huh, what's going on here? Where is my interpreter?  So nothing." [DE 235-19, p. 2][1] She said she was not made privy to any prior conversations between Cardenas and her son [DE 235-19, p. 3], and that her only communication with Dr. Cardenas was when he checked her heart before starting the procedure and gestured that everything was good.  She said she did not even understand that she had suffered a heart attack until after the procedure was done, when her son explained the situation to her  in the recovery room [DE 67-8; 235-19, p. 5].

While still in recovery from the catheterization procedure, Ms. Sunderland developed an intraperitoneal hematoma (an uncontrolled bleed from the catheter insertion site), a "known and common" risk of catheterization, and was rushed into emergency surgery for femoral artery puncture and rupture. She underwent several blood transfusions (after her son signed consent papers (DE 235-19, p. 12)), and  was placed on a ventilator in the intensive care unit, where she remained sedated and intubated for a few days.

When she initially awoke after surgery, a hospital staff member gave her a piece of paper which read, "Sandra - We are letting you wake up.  You had surgery last nite.  You have a breathing tube in your throat.  We want to take it out very soon but you must relax to help us. Can you do that?"  [DE 235-13] [DE 235-19, p. 81].  The next day, October 30, 2012, a nurse noted in Ms. Sunderland's chart that she had participated in education of medication and side effects, but with "questionable comprehension" [DE 235-1, p. 4].

---

[1] It is unclear from this testimony if Ms. Sunderland is describing comments she made to the nurse, or whether she is describing her own internal thought process at the time.

On the fifth day of her admission, November 3, 2012, after coming out of sedation, Ms. Sunderland and her son asked her attending nurse to provide a live, on-site interpreter [DE 235-8, p. 18].  This request was not accommodated, but the nurse did provide VRI services as an auxiliary aid on that date.   However, according to Ms. Sunderland, the nurse seemed unsure how to use the machinery, and five other  nurses were called in to try to help hook it up. The machine was ultimately engaged and used two times for a total of 27.3 minutes on this date, although Ms. Sunderland complained that it was not working well, contending it "was going off and on … it was freezing … a lot of problems" [DE 135-19, p. 5, 1-5-106].  Her son relayed her frustrations with the equipment to hospital staff, and requested that an on-site interpreter be provided in lieu of the VRI computer [235-8, p. 18].[2]

No VRI was used on November 4 or November 5, 2012.  During this time, hospital staff relied on notes, lip-reading and assistance from Ms. Sunderland's son to communicate.

On November 6, 2012, three VRI calls were made: 3.88 minutes, .07 minute, and 4.62 minutes, for a total of 8.57 minutes.  The son complained that the VRI was not used more that day, and asked to talk to the attending physician.  He was provided with contact information for Ms. Sunderland's primary care physician, Dr. Deitsch, who he tried to reach by telephone without success.

On November 7, 2012, four VRI calls were made, for a total of 34.19 minutes throughout the day.  On this date, Ms. Sunderland contends that Dr. Deitsch was offered but refused use of the VRI,  saying  he "didn't have time" for it when the nurse was setting it up.  He instead gestured to Ms. Sunderland, using  "sleep hands" pressed to the side of his face, indicating that she was

---

[2] Sunderland testified that throughout  the seven or eight times the VRI was used during her admission, it was generally "very blurry, frozen screen… just terrible;" however, she acknowledged one instance, when the nurse was explaining use of her medications, where it worked for approximately six minutes without interruption [DE 235-19, p. 11].

going home and everything would be fine [DE 235-19, p. 6].    According to the chart, Dr. Deitsch was also used pen and paper to communicate with Ms. Sunderland throughout her admission [DE 235-1, p. 9].

On November 8, 2012, Ms. Sunderland was discharged.   A note in the chart by case manager, Adner Accius, indicates that he communicated with Ms. Sunderland at this time using an online interpreter to explain that her doctor had ordered discharge to a skilled nursing facility. Ms. Sunderland told the case manager that her other doctor, Dr. Deitsch, had already approved a direct discharge to her home, since she could walk well.

Two years later, in the fall of 2014, Ms. Sunderland had a pacemaker implanted at JFK Medical Center in Atlantis, Florida. The doctor who placed the pacemaker, Faren Angella, testified that the pacemaker is functioning normally and has an average remaining longevity of nine years [ECF 235-1].

 The conditions for which Ms. Sunderland is currently being treated by her primary care physician, Dr. Nuria Rodriguez -- coronary atherosclerosis; atrial fibrillation; old myocardial infarction; senile osteoporosis; unspecified diastolic heart failure; unspecified hypothyroidism; chronic kidney disease, Stage II (mild); cardiac pacemaker; abnormal  radiological  findings  in lung, chronic pulmonary heart disease, chronic airway obstruction, depressive disorder and pain in joint, pelvic region and thigh – are all stable or under control [DE 235-1], and Dr. Rodriguez has directed  Ms. Sunderland to return for routine follow-up appointments at three-month intervals.

Ms. Sunderland's cardiologist, Dr. Roberto Von Sohsten, assigns current diagnoses of arteriosclerotic heart disease, atrial fibrillation, hyperpiesia, hypertension and pulmonary hypertension, and describes her coronary disease as "stable." [DE 235-2]. At deposition taken

December 16, 2015, Dr. Von Sohsten testified that it was impossible to opine, within a reasonable degree of medical probability, as to whether Ms. Sunderland's cardiac condition will require her to be hospitalized in the near future [ECF 290-1, p. 2].  He further explained:

> I think she eventually will go back to the hospital, you know, because of either the atrial fibrillation, perhaps a bleeding problem because now she's on blood thinners for life, or because of progression of her coronary disease.  The timing of that is unpredictable. I think she's stable.  If you ask me today my best judgment, my best assessment, I don't expect that she will destabilize in the next few months.  That was the question posed to me, if within the next three months she would, you know, have a high likelihood of landing in the hospital.  But it is unpredictable.

[ECF 290-1, pp. 4-5]

At deposition taken September 11, 2014, Ms. Sunderland testified she did not have any future procedures scheduled at a Bethesda facility, and that in any event she would "never again" return to a Bethesda facility because Bethesda does not provide live, on-site interpreters.  She said she did not "believe in" VRI, explaining "[I]t's too dangerous for us… It just doesn't work and that's it" [DE 235-19, p. 9].[3]  In her affidavit dated December 17, 2014, filed in opposition to the current motion for summary judgment,  Ms. Sunderland  backtracked from this statement, stating it was based on Bethesda's historical reliance on VRI computer imaging as an auxiliary communication device despite known problems with its performance, and that she would like to return to Bethesda in the future if it changes its practices "to ensure effective communication," because Bethesda is the closest hospital to her home [DE 67-8, p. 2].

---

[3] Sunderland testified that in the seven or eight times the VRI was used during her admission, it was generally "very blurry, frozen screen… just terrible," although she acknowledges one instance, when the nurse was explaining her medications, where it worked for approximately six minutes without interruption  [DE 235-19, p. 11].

## 2. Barbara Drumm

Plaintiff Barbara Drumm is an eighty-year-old woman who presented at the Bethesda Memorial emergency room on February 25, 2012, complaining of back pain[4] [DE 223-5]. During triage processing, hospital staff noted that Ms. Drumm "requests to read lips and write/refuses interpreter" [DE 223-10]. Ms. Drumm, however, denies saying this [DE 223-25, p. 8].  Because of abnormal EKG and mid-back pain, she was admitted to the hospital where she had daily EKGs, and underwent an MRI. She was diagnosed with hypertension and back pain secondary to degenerative disc disease, and prescribed pain medicine, anti-inflammatory medication and hypertension medicine [DE 223-8].

On the third day of her admission, February 27, Ms. Drumm's daughter complained about patient communication problems and a VRI machine was brought to Ms. Drumm's room [DE 223-25, p. 11]. Hospital records show one four-minute VRI call on that date [DE 67-4, 5].   Dr. Jaffee, her attending physician, communicated with Ms. Drumm through a visitor on this date, although Ms. Drumm later complained to her nurse that her visitor was also deaf and therefore could not have been a reliable interpreter [DE 223-11, p. 14].

On the following day, Ms. Drumm asked another visitor to find out if her doctor was coming back and whether she was ready for discharge; the nurses placed a call into Dr. Jaffee, who relayed that he did not intend to return as he had just seen Ms. Drumm the day before and explained her situation through a visitor at the patient's bedside [DE 223-11, p. 14].  Ms. Drumm was discharged on February 28, 2012, with VRI machinery used to explain discharge

---

[4] Ms. Drumm contends she went to Bethesda to have a stress test as directed by doctor, although the records of her treating physician Martha Rodriguez make no mention of such a direction; Dr. Rodriguez's office notes indicate she saw Ms. Drumm on February 23rd for complaints of  upper right back spasms and stiffness after lifting groceries.

instructions for her high blood pressure medicine, pain and muscle relaxant medicines [DE 223-9, p. 2][DE 223-25, p. 11].

On April 30, 2013, Ms. Drumm again presented at the Bethesda Memorial emergency room complaining of chest discomfort radiating into her left arm [DE 223-19, 223-20]. Nursing triage notes indicate that she communicated with pen and paper, and requested VRI [DE 223-22], which was used to take her history and conduct an initial physical examination [DE 223-20].[5]

The next day, May 1, 2013, Ms. Drumm had a cardiac stress test for which she signed a written consent.  The test results were negative [DE 223-21], leading her attending physician to conclude that her complaints of pain were musculoskeletal-related.  She was discharged at 7 p.m. A week later, Ms. Drumm followed up with her primary care physician and explained to him that she had recently been admitted to Bethesda for a full cardiac work-up, and that all of her tests returned negative, with adjustments made accordingly to her medications.

Ms. Drumm is currently diagnosed by her primary care physician, Dr. Martha Rodriguez, with "allergies, seasonal; diverticulosis of the large intestine without perforation, abscess or bleeding; HTN with renal disease, kidney disease, chronic, stage II" [DE 223-1] and is seen for routine follow up examinations. According to Dr. Rodriguez's most recent office note of August 24, 2015, her conditions are stable.

Ms. Drumm states that Bethesda Memorial is the closest hospital facility to her, and that she plans on returning to it in the future for medical care, although she acknowledges that she has no medical procedures currently scheduled.

---

[5] According to plaintiff's opposition papers, a cardiologist consultation was obtained at the outset from Dr. Styperek, who  initially wrote to Dr. Deitsch, Ms. Drumm's attending physician, that he would consider her for a cardiac catheterization if someone could explain to her the benefits and pitfalls of the procedure [DE 230, p. 15]. However, plaintiff provides no record support for this statement which the court is unable to otherwise substantiate.

### 3.  Carolann Donofrio

Carolann Donofrio is a seventy-eight year old woman.  She was admitted to Bethesda Memorial with complaints of rapid heartbeat on two separate occasions. On the first admission, January 5, 2013, VRI was continuously used for over two hours, beginning at 3:30 a.m., the point of intake. The emergency room attending physician, Dr. Gregory Deitsch, took a history and performed an initial physical examination, noting that a "sign language interpreter on the telemonitor" was used during this process, and the nurse flow chart similarly notes that a "translating machine" was provided at this time [DE 241-8].

The chart also notes that staff was able to communicate with Ms. Donofrio throughout her admission using the VRI and lip-reading.  Records from "Life Links," the company which provides video remote interpreting service for Bethesda, show that VRI was periodically used throughout the day of January 5th and into the next day up through approximately 1 p.m.   Ms. Donofrio, however, denies that VRI was used to communicate with her during her initial examination by Dr. Deitsch or at any of these other times [DE 241-3, p. 8].

Ms. Donofrio underwent routine blood work, a chest x-ray, an EKG and echocardiogram. The consulting cardiologist, Dr. Rodolfo Carrillo-Jimenez, diagnosed her with paroxysmal atrial fibrillation and hypertension, noted to be "under excellent control," and observed "[t]he patient is otherwise stable [DE 241-10].  She was discharged on January 6, 2013 [DE 241-9] and signed discharge instructions for "atrial fibrillation" affirming her understanding of the instructions [DE 241-12].

Life Link records show VRI was used three times on the date of discharge; twice in the morning and once in the afternoon for 6.5 minutes just prior to discharge.  In her current summary judgment papers, plaintiff  argues that Bethesda hospital staff made three unsuccessful

attempts to connect to VRI on this date, without calling for an on-site interpreter, but she does not cite any record evidence in support of this contention [ECF 250 p. 15].

Ms. Donofrio was again admitted to Bethesda Memorial emergency room with complaints of rapid heartbeat on July 6, 2013. On this occasion, hospital staff was not able to activate the VRI machinery and made arrangements for an on-site ASL interpreter to facilitate communications.  The first interpreter arrived at 4:00 a.m. and stayed until 9 a.m.; the second interpreter arrived at 9 a.m. and stayed until 5 p.m. [DE 241-23]. Ms. Donofrio had the same routine, noninvasive procedures performed as she did in her prior admission, and was again diagnosed with atrial fibrillation and hypertension [DE 241-18].

VRI was operational and used several times before her discharge on July 9, 2013; a cardiologist consultation, for example, was conducted by Dr. Janus Styperek, whose notes indicate that VRI was used to communicate with Ms. Donofrio during his physical examination [DE 241-3, p. 10-11].   However, Ms. Donofrio complains that VRI was not working well throughout her July admission, explaining "it would go out and they would have to unplug it, plug it back in," and that "[i]t was blurry and it was very frustrating" [DE 241-3, p. 9].

Ms. Donofrio is currently diagnosed by her primary care physician, Dr. John Lopera, with "chronic kidney disease stage iv (severe), stable," "unspecified diastolic heart failure, HD stable," "esophageal reflux, stable," "hypercalcemia, resolved," "atrial fibrillation … stable," ("stable"), "unspecified hypothyroidism, on replacement, normal TSH," "unspecified essential hypertension, adequate control," "mixed hyperlipidemia … on statins; lifestyle modification," and "open-angle glaucoma unspecified"  [DE 241-1, pp. 3-4].  At her last physical examination, June 2015, Dr. Lopera found Ms. Donofrio to be "overall: in no acute stress" and directed her to return for routine three month follow up lab testing.  *Id.*

Her cardiologist, Dr. Andres Ruiz, performed a routine follow-up examination on May 26, 2015, finding her in "no acute distress," with "improved episodes of palpitations," "normal thyroid function" and "no evidence of ischemia," and directed her to return for a routine six-month follow up evaluation [ECF 241-2].

## B.  Procedural History

In their operative Third Amended Complaint, Plaintiffs assert that Bethesda failed to provide interpreting services adequate to ensure effective communication with them during each of their respective hospital stays, and that this lack of effective communication violated their rights under Title III of the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.*, and section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794, by depriving them of an equal opportunity to participate in and enjoy the benefits of the hospital's services. Plaintiffs seek injunctive relief reforming Bethesda's policies and procedures, as well as compensatory damages, attorneys' fees and costs. In its current motions for summary judgment, Bethesda contends that Plaintiffs are unable to demonstrate entitlement to either form of relief.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). An issue is "material" if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *U.S. ex rel. Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1289 (11th Cir. 2014).

If the movant meets its initial burden under Rule 56 (c), the burden shifts to the nonmoving party to come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56 (e). "[T]o survive summary judgment the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz*, 780 F.3d at 1050 (citing *Brooks v. Cty. Com'n of Jefferson Cty., Ala.,* 446 F.3d 1160, 1162 (11th Cir. 2006).

In ruling on a motion for summary judgment, the Court must construe the facts alleged in the light most favorable to the nonmoving party and resolve all reasonable doubts about the facts in favor of the non-movant. *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 337 (11th Cir. 2012).   However, a court need not credit affidavit evidence which directly contradicts with earlier, sworn testimony of a party.   That is, "[w]hen a party has given clear answers to unambiguous question which negates the existence of any genuine issue of material fact, that party cannot thereafter create such an in issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).   Thus, a district court may strike as sham an affidavit which contradicts testimony deposition when the party merely contradicts prior testimony without giving any valid explanation. *Id.*at 56.   In order to be stricken as a sham, however, an affidavit must be "inherently inconsistent."

### III. DISCUSSION

### A. GOVERNING LAW: ELEMENTS OF CLAIM

Title III of the ADA applies to privately-operated public accommodations, including hospitals, and prohibits discrimination "on the basis of disability in the full and equal employment of goods, services, facilities, privilege, advantages or accommodations." 42 U.S.C.

§12182 (a); 42 U.S.C. § 12181 (7) (f) (defining hospitals as public accommodations). Such discrimination includes:

> a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden …

*Id*. § 12182(b)(2)(A)(iii).   A Department of Justice regulation implementing Title III further provides that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities." 28 C.F.R.§ 36.303 (c).

Although Title III does not allow a private party to seek damages, it does provide for injunctive relief. 42 U.S.C. §12188 (b) (2); *Dudley v. Hannaford Bros. Co*., 333 F.3d 299, 304 (1st Cir. 2003): *Pickern v. Holiday Quality Foods, Inc*., 293 F.3d 1133, 1136 (9th Cir. 2002).  To establish standing for such relief, a plaintiff must show that he or she will suffer an injury in fact which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992).  Past exposure to illegal conduct is not, in itself, sufficient to show that real and immediate threat of injury necessary to make out a case or controversy  *City of Los Angeles v. Lyons*, 461 U.S. 95, 103, 105-106, 103 S. Ct. 1660, 75 L.Ed.2d 675  (1983).  Past wrongs can be considered, however, as evidence of an actual threat of repeated injury.  *Henschen v. City of Houston, Tex.,*  959 F.2d 584 588 (5th Cir. 1992), citing *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S. Ct. 669, 38 L.Ed. 2d 674 (1974).

Section 504 of the Rehabilitation Act, in turn, provides that "[n]o otherwise qualified individual with a disability in the United States… shall, solely by reasons of her or his disability, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 21 U.S.C § 794 (a).

The ADA and Rehabilitation Act claims are governed by the same legal standards. *Cash v. Smith,* 231 F.3d 1301, 1305 (11th Cir. 2000). To prevail under either Act, the plaintiffs must prove (1) they are qualified individuals with a disability (2) who were excluded from participation in or denied the benefits of Bethesda's hospital services programs or activities, or otherwise discriminated against (3) on account of their disability. *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 21001).

To recover compensatory damages under the Rehabilitation Act, a plaintiff must further show that the exclusion or denial was the result of intentional discrimination. *Liese v. Indian River Cty. Hosp. Dist.,* 701 F.3d 334, 344 (11th Cir. 2012); *Delano-Pyle v. Victoria Cty., Tex.,* 302 F.3d 567, 574 (5th Cir. 2002). In this circuit, a "deliberate indifference" standard is applied to determine whether a hospital's failure to provide an appropriate auxiliary aid to a hearing-impaired patient was the result of intentional discrimination in violation of the Act; that is, discriminatory animus is not a required element of claim. *Liese* at 347-48.

Further, for an organization, such as a hospital, to be liable for deliberate indifference to violation of a patient's rights under the Rehabilitation Act, a plaintiff must show deliberate indifference on the part of "an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the [organization's] behalf [and who] has *actual knowledge* of discrimination in the [organization's] programs and fails to adequately

16

respond. *Liese* at 349 (emphasis in original), quoting *Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 290, 118 S. Ct. 1989, 1999, 141 L.Ed. 2d 27 (1998).

In this case, plaintiffs urge that every employee of Bethesda staff who knew of a plaintiff's impairment and had the authority to ask for a live, on-site interpreter is an "official" within the meaning of *Liese,* However, such a broad approach in defining the contours of an "official" for attribution purposes under the Rehabilitation Act was considered and explicitly rejected by the Eleventh Circuit in *Liese* as one which "essentially eviscerates the requirement that there be a decision by an official." *Id* at 350. In *Liese*, the Court noted that "the purpose of the official' requirement is to ensure that an entity is only liable for the deliberate indifference of someone whose actions can fairly be said to represent the actions of the organization." *Id.* at 340, citing *Gebser,* 524 U.S. at 2909, 118 S. Ct. 1989, and that "the question of how far up the chain of command one must look to find an 'official' is necessarily a fact-intensive inquiry, since an official's role may vary from organization to organization." *Id.,* citing *Doe v. Sch. Bd. of Broward County, Fl*., 604 F.3d 1248, 1255 (11th Cir. 2010).

Under current, binding Eleventh Circuit precedent, an "official" in this context is defined as "someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Liese* at 350, citing *Doe*, 604 F.3d at 1256-57. "The 'key decision point' language reflects the practical reality that, while some decisions are technically subject to review by a higher authority, such a review is not part of the entity's ordinary decision making process." *Id*.

Reviewing the summary judgment record before it in *Liese*, the Eleventh Circuit ultimately concluded that there was a least a fact question as to whether the doctors at issue had complete

discretion to decide whether to provide a patient with an interpretative aid. Accordingly, whether the doctors could be characterized as "officials" was an issue properly reserved for the jury. The Court recognized evidence suggesting any hospital staff member had authority to ask for an interpreter, or to retrieve VRI equipment from a storage closet, but focused only on the doctors as potential "officials" for attribution purposes because the evidence "suggest[ed] strongly that the doctors had supervisory authority" over the decision to order an interpreter, with ability to overrule a nurse's decision not to provide auxiliary aid.

## B. Application

### 1. Discrimination on the Basis of Disability

It is undisputed that all Plaintiffs in this case are qualified individuals with a disability. The threshold question presented on summary judgment is therefore whether there is a disputed issue of fact on question of whether Bethesda violated federal law by excluding Plaintiffs from, or denied them the benefits of, the hospital's services or programs by failing to provide live, on-site ASL interpreter services after plaintiffs expressed dissatisfaction with the efficacy of VRI services and a preference for live, on-site interpreters. If so, the inquiry appropriately turns to whether Plaintiffs are able to demonstrate a genuine issue of material fact pertaining to their entitlement to injunctive relief under the ADA or compensatory damages under the Rehabilitation Act.

On the threshold liability issue, Bethesda does not contest that the ADA and Rehabilitation Act require that it provide deaf and hearing-impaired patients with effective communication. It argues, however, that the auxiliary aids and service necessary to ensure effective communication are context specific, 28 C.F.R. §36.303 (c) (1) (ii) (type of aid or service will vary with method of communication used by patient, nature length and complexity of the communication involved,

and context in which the communication is taking place), and in this case there is no evidence that Bethesda failed to provide effective communication to any one of the three plaintiffs. Further, it urges the Court to infer the existence of effective communications by virtue of lack of evidence that any plaintiff was misdiagnosed, given the wrong medication, failed to understand or follow discharge instructions, or was otherwise harmed by a communication lapse with treating medical personnel.

The Court disagrees and rejects the proposition that lack of evidence of "adverse results" defeats any issue respecting the efficacy of communication. The statute and implementing regulations do not suggest an "adverse action" element as necessary to state a cause of action, nor is there any statutory authority defining an "ineffective" communication as one which results in adverse medical consequence. To be "ineffective," the Court finds it sufficient that the patient experiences a real hindrance, because of her disability, which affects her ability to exchange material medical information with her health care providers.

Applying this standard here, the Court finds that a genuine issue of fact exists as to whether Plaintiffs Sunderland and Drumm were deprived of their right to "effective communication" as a result of Bethesda's reliance on intermittent VRI service as an auxiliary aid during their hospital stays. As to Ms. Donofrio, the question is much closer, but the Court need not reach the issue because of other, more serious deficiencies discussed below. Each plaintiff contends that VRI computer technology was used in effort to provide ASL interpreting service at some point during her admission, and each complains it was not functioning properly, resulting in blurry images and "freezing up;" each also complains that her or a family member's expression of dissatisfaction with the level of communication provided through VRI computer technology, and corresponding requests for alternative use of live, on-site ASL interpreters to address the

communication failures were either ignored or denied by hospital staff.  Consequently, each alleges they were unable to understand what was  wrong with them or what was happening to them during their hospital stays, impeding their ability to meaningfully participate in the management of their own health care.

The Court recognizes  that the Defendants are not required to provide ASL on-site interpreters as a matter of course in order to achieve "effective communication" with hearing-impaired patients, i.e. that there is no *per se* rule that qualified live, on-site ASL interpreters are necessary to comply with federal law.  The Court also recognizes that  while the governing regulations provide a public accommodation should consult with individuals with disability whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, the ultimate decision as to what measures to take rests with the public accommodation, provided the resulting communication is effective.  28 C.F.R. §36.303(c) (1) (ii).  *See also Feldman v. Pro Football, Inc*., 419 Fed. Appx. 381, 392 (4th Cir. 2011). The auxiliary aid requirement is a flexible one, and "full and equal enjoyment" is does not necessarily mean "mean that an individual  with a disability must achieve an identical result or level of achievement as persons without a disability."  *Id*; 45 C.F.R. § 84.52(d).

 In this case, however, there is evidence that  Bethesda's default reliance on VRI as an auxiliary aid resulted in patient comprehension failures – known to hospital staff -- and corresponding impediments to each  patient's ability to meaningfully understand and participate in her own course of medical treatment.

Thus, assuming the existence of disputed issues of fact on the central liability question of whether Bethesda failed to provide auxiliary aids necessary to achieve "effective communication" by its hearing-impaired patients, the inquiry turns to the issue of whether the

plaintiffs can demonstrate entitlement to either form of relief demanded under Title III of the ADA or Section 504 of the Rehabilitation Act.

## 2. Entitlement to Relief under the ADA or Rehabilitation Act

### a. Injunctive Relief

A private party may seek only injunctive relief under Title III of the ADA, 42 U.S.C. § §12188(A)(1)(2012), while a plaintiff may seek injunctive relief and compensatory damages under Section 504 of the Rehabilitation Act upon showing of intentional discrimination.    To show standing to seek injunctive relief, plaintiffs must show the existence of a "real and immediate" threat of future hospitalization at a Bethesda facility;   in the context of the instant summary judgment proceedings, they must show the existence of disputed issues of fact bearing on this central question.

Upon careful review of the record,  the Court finds this burden has not been met. There is no evidence of a "real and immediate" threat that any one of the plaintiffs will return to Defendant's hospitals in the near future, nor is there any reliable evidence that VRI technology will malfunction in the future and that plaintiffs will not be provided with an alternative, adequate auxiliary aid in such an instance.

Plaintiffs seemingly advance the position that an elderly person suffering from a chronic, progressive medical condition necessarily demonstrates a "real and immediate" threat of future hospitalization which is sufficient to at least create an issue of fact on the question of standing to seek injunctive relief.  In the absence of corroborating expert medical evidence regarding the likelihood  an imminent future hospital admission, the  Court disagrees. *McCullum v. Orlando Regional Healthcare System, Inc*., 768 F.3d 1135 (11th Cir. 2014) (no standing to seek injunctive relief where plaintiff failed   present evidence to support contention that allegedly chronic

21

medical condition – ulcerative colitis - actually created a real and immediate threat that he would return to the defendants' facilities).

In addition to lack of evidence on the likelihood of an imminent future admission, plaintiffs do not show a likelihood of VRI malfunctioning at a Bethesda facility in the future, nor do they show that an interruption in VRI services, should it occur, would prevent effective communication in the future. Defendants have demonstrated they are willing to provide auxiliary aids, including in person, on-site ASL interpreters, where VRI malfunctions. Indeed, this occurred in the case of Ms. Donofrio, who was provided twelve hours of continuous on-site ASL interpreting services when the VRI machine malfunctioned. Additionally, Defendants show that their existing policy calls for use of live,  on-site interpreters if  VRI is not adequate to ensure effective communication.

Plaintiffs have not raised a genuine dispute of fact regarding the likelihood of future injury, the Court concludes they lack standing to seek injunctive relief, and shall accordingly enter summary judgment on all claims asserted under Title III of the ADA, as well as the claims asserted under Section 504 of the Rehabilitation Act insofar as they seek injunctive relief.  *See McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135, 1145-46 (11th Cir. 2014).

### b.  Compensatory Damages

Bethesda further asserts that summary judgment is warranted under the Rehabilitation Act claims because no plaintiff is able to demonstrate the existence of disputed issues of fact on the question of whether the hospital intentionally discriminated against her within the meaning of the Act.  *Liese,* 701 F.3d at 343-44.  As discussed above, in order to present a jury question on this issue, a plaintiff must at least raise a genuine issue of material fact on the question of

whether an "official" of the hospital, whose actions may properly be attributed to the organization, engaged in "intentional discrimination" her, i.e. the plaintiff must adduce some evidence suggesting that an "official" of the hospital was "deliberately indifferent" to a violation of her rights under the Act. *Liese*, 701 F.3d at 345.

Deliberate indifference occurs when an individual knows that a violation is substantially likely and fails to act on that likelihood. *Id* at 344; *Doe v. Sch. Bd of Broward Cnty., Florida*, 604 F.3d 1248, 1259 (11th Cir. 2010). This involves an element of "deliberate choice," which is not met with evidence of mere negligence. *Liese*, 701 F.3d at 344. More specifically, a plaintiff must show the existence of disputed issues of fact on central question of whether an "official" of the hospital made a decision not to supply a live on-site interpreter, knowing that there was a substantial likelihood that the patient would not be able to communicate effectively without this auxiliary aid. *McCullum*, 768 F.3d at 1147-48.

Plaintiffs contend that any hospital staff clinician who interacts with a patient is an "official" for purposes of this standard, contending that the Eleventh Circuit has somehow "retreated" from its holding in *Liese* requiring that deliberate indifference must be attributed to "an official who at a minimum has authority to address the alleged discretion and to institute corrective measures" on the organization's behalf." In this regard, plaintiffs point to language in the Eleventh Circuit's more recent opinions in *McCullum* and *Martin v. Halifax Healthcare Systems, Inc.,* 2015 WL 451796, ___ Fed. Appx. ____ (11th Cir. 2015), where reference is made to the conduct of "hospital staff" in conjunction with the court's assessment of whether the evidence is susceptible to a finding of "deliberate indifference" on part of the defendant hospital. A close reading of *McCullum*, however, shows there is no support for the radical departure from the holding in *Liese* here advanced by plaintiffs.

Indeed, in *McCullum*, the Eleventh Circuit explicitly cites with approval to *Liese*'s requirement for evidence of decision-making by an "official" as a predicate for triggering organizational liability under the Rehabilitation Act.  After describing the conduct of hospital "staff" at issue in that case, and finding no genuine issue of material fact on question of whether any staff person engaged in conduct which deprived plaintiffs of their right to equal treatment and "effective communication," the Court noted:

> To prevail on [plaintiff's] claims seeking damage from the hospitals, the patients must also show deliberate indifference on the part of "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the organization's behalf, and who has actual knowledge of discrimination in the organization's programs and fails to adequately respond." *See Liese*, 701 F.3d at 349 (alterations omitted); *see also Gebser v. Lago Vista Independ. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999, 141 L.Ed. 2d 27 (1998).  Because we conclude that [plaintiff] has not presented sufficient evidence of deliberate indifference by a [hospital] staff member, we need not address whether the nurses and doctors treating him qualified as "officials" within the meaning of *Liese* and *Gebser*.

*McCullum* at 1149 n. 9.

In contrast, in this case the Court finds the existence of a disputed fact issue on the predicate liability question of whether Bethesda bedside nursing staff exhibited deliberate indifference to the needs of the plaintiffs by failing to obtain live, on-site ASL interpreters at plaintiffs' request in the face of complaints about the efficacy of VRI technology as an auxiliary aid. Therefore, unlike the situation in *McCullum* or *Martin*, the Court in this case *does* need to address the issue of whether there is evidence that adverse decision-making regarding auxiliary aids can be attributed to a hospital "official" within the meaning of *Liese* and *Gebser*. Having addressed this inquiry, the Court concludes there is no evidence from which a reasonable jury could find that the Bethesda nursing staff who allegedly deprived plaintiffs of their right to effective communication qualified as "officials" in the *Liese* sense.

Plaintiffs contend that evidence showing any hospital employee who is a clinician taking care of a patient has the authority *to ask for* a live interpreter [DE 241, 67-8, 235-18] equates to a showing that any person who is a clinician taking care of a patient is an "official" of the hospital possessing sufficient discretionary authority to trigger organizational liability; thus, in this case, plaintiffs contend that evidence of the bedside nurses' failure to meet the plaintiffs' demands for on-site ASL interpreters is sufficient to raise a jury question on whether a  hospital "official" intentionally discriminated against them.

The ability to *request* the provision of a certain auxiliary service or aid is not the equivalent of the discretionary ability to *order* such aid without pre-approval from another level of authority in the hospital administration's chain of command. Here, the undisputed evidence shows that only the hospital administrator on call and risk manager are persons at Bethesda vested with discretion to conclusively grant or deny a patient or staff member's request for on-site, live ASL interpreters as an auxiliary aide for a hearing-impaired patients or family members of such a patient.

There is no evidence that Ritson or any hospital administrator on call was ever contacted with a complaint about the functionality or efficacy of VRI services for any of the plaintiffs at issue in this case, nor is there any evidence, in general, that either category of hospital "official" ever refused a request for live, on-site ASL interpreting service when requested by a nursing supervisor, patient or hospital staff member.  Indeed, the nursing supervisor, to whom all requests for VRI services are referred in ordinary course as a matter of standard operating hospital policy and procedure,  testified she was only aware of two instances where a patient or staff complained about the  functioning of VRI, and in both instances she requested, and obtained authorization for, provision of an on-site interpreter.

25

Because there is no evidence that would allow a reasonable jury to conclude that the floor nurses to whom requests for on-site interpreters were directed in the three cases at issue had "complete discretion" at a "key decision point" in the administrative process to provide such assistance, plaintiffs fail to demonstrate a threshold, disputed issue of material fact on the central liability question of whether a relevant hospital "official" acted in deliberate indifference to their federally protected rights under the ADA or the Rehabilitation Act. Accordingly, Defendants are entitled to entry of final summary judgment in their favor on all Rehabilitation Act claims.

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. The defendants' motion for summary judgment is **GRANTED** on all claims asserted under the ADA and Rehabilitation Act as to plaintiffs Sandra Sunderland, Barbara Drumm and Carolynn Donofrio**.**

2. Pursuant to Rule 58, final summary judgment in favor of defendants shall be entered accordingly by separate order of the court.

3. All pending motions are **DENIED as MOOT** as to the above-named plaintiffs.

4. The trial and all corresponding pretrial deadlines are **CANCELLED** as pertaining to the above-named plaintiffs.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 3rd day of February, 2016.

United States District Judge
Southern District of Florida