UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80685-CIV-HURLEY

SANDRA SUNDERLAND et al.,
      Plaintiffs,

vs.

BETHESDA HEALTH, INC. et al.,
      Defendants.
_____/

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT AS TO PLAINTIFFS
JACQUELINE GLUCKMAN, JOHN DONOFRIO, & BODIL TVEDE,
[DE Nos. 229, 231 & 237]

**THIS CAUSE** is before the Court on the Defendants' motions for summary judgment as to the disability claims of Plaintiffs Jacqueline Gluckman, John Donofrio, and Bodil Tvede. arising under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act of 1973 (the "Rehabilitation Act"). Having carefully reviewed the evidentiary record and considered the parties' arguments and relevant legal authorities, the Court has determined to grant the Defendants' motions for summary judgment for reasons more particularly expressed below.

## I. BACKGROUND

### A. Factual Background

Defendant Bethesda Hospital, Inc., and Bethesda Health, Inc. (cumulatively "Bethesda") own and operate Bethesda Memorial Hospital ("Bethesda Memorial") and Bethesda Hospital West ("Bethesda West"), both located in Boynton Beach, Florida. The three individual plaintiffs are deaf persons who communicate primarily through the use of American Sign Language ("ASL") and who were treated at Bethesda Memorial on various dates between 2011 and 2013.

1

Plaintiffs Gluckman and Tvede allege they requested live, on-site ASL interpreting services during their interaction with the hospital's staff, but the hospital failed to honor their requests. Plaintiffs contend this failure deprived them of effective communication with hospital staff in violation of their rights under the ADA and the Rehabilitation Act. Plaintiff Donofrio does not claim to have requested an on-site interpreter but, nonetheless, claims to have been deprived of effective communication.

Bethesda maintains a policy governing communication with its hearing-impaired patients, "Operations Regulation 1118," eff. December 28, 1990, last updated on January 18, 2012. This policy, effective during the hospital admission of each of the above-named plaintiffs, provides at Section IV.C., "Procedure - Hearing Impaired:"

> For the purpose of rendering emergency health care, the Hospital provides telecommunication devices including a Teletypewriter (TTY) and a Video Remote Interpreting (VRI) Computer on Wheels. The Teletypewriter (TTY) unit is stored in the Communication Department for all areas to access to aid communication with patients or the next of kin who will be making health care decisions for the patient with impaired sensory, manual or speaking skills.  The Video Remote Interpreting (VRI) computer is stored in the Nursing Supervisor's office and will be brought to the area requesting the unit by the Nursing Supervisor.  When finished with the Teletypewriter (TTY) and/or the Video Remote Interpreting (VRI) computer, the TTY must be returned to Communications and the Video Remote Computer to the Nursing Supervisor's office.

> In those circumstances where VRI does not accommodate patient need the nursing administrative supervisor and or risk management will be contacted to assist with providing an alternative communication mode such as via Nationwide Interpreter Resource Inc. (561-715-2346).

> The Human Resource department shall maintain a list of employees with documentation of competency to interpret using sign language.  These employees shall be available during their shift to assist in the communication and interpreting with patients and visitors when VRI does not accommodate patient need.  [DE 235-4, p. 4].

Gary Ritson, Bethesda's former Vice-President for Risk Management, was at all material times the person responsible for ensuring compliance with Bethesda's accommodations policy for hearing-impaired persons. Mr. Ritson worked for Defendant since 1977 and was "personally" involved in creating policies or procedures for providing services for deaf patients. [DE 239-4, p. 9]. He testified that Bethesda routinely relies on VRI as an auxiliary aid for all foreign languages [DE 235-5, p. 16], except in instances when it is not functional, in which case a live, on-site interpreter is called [DE 241-28, pp. 6-8].

With regard to deaf patients, VRI involves use of a live ASL interpreter to facilitate communication with the patient via mobile video equipment. If a Bethesda patient expresses a preference for communicating through a live interpreter, his or her bedside clinician is responsible for initiating a request for VRI from the nursing supervisor [DE 235-5, p. 18]. The bedside nurses are entrusted with responsibility to determine the need for VRI services, and the hospital relies on their judgment to determine functionality of the VRI machines when they are used. If the machines are not operational, technical staff may be brought in to assist; if the problem cannot be corrected, the nursing supervisor must contact the "Administrator on Call" or Risk Manager for authority to hire a live, on-site interpreter [DE 235-25].

Ritson was never personally involved in a situation where VRI was not functioning, [DE 235-25]. He knew of one technical issue with the VRI in August 2014 [DE 239-5, p. 9] and was aware of 6 or 7 patients not wanting to use the VRI in 2011/12 (it is unknown if any those patients were one of the plaintiffs) [*Id*. at 10-11]. He testified that all complaints regarding VRI would go to him. [*Id*. at 9]. In addition, Mr. Ritson testified he was unaware of any complaints regarding the hospital's staff not knowing how to operate the VRI [*Id*. at 12]. In summary, Mr. Ritson – the person responsible for Defendants for receiving all complaints relating to VRI - did

3

not know of any specific complaint raised by Jacqueline Gluckman, John Donofrio and, inferably, Bodil Tvede regarding VRI during their time in the hospital [*Id*. at 15].

Dorothy Kerr, Bethesda's nursing supervisor, testified that the policy at Bethesda governing use of VRI technology allows any staff person to request the VRI from the nursing supervisor, and that, upon such request, she as nursing supervisor was responsible for delivering the VRI to the patient's room [DE 235-26, p. 8]. Kerr recalled only two occasions where she needed to obtain on-site ASL interpreters for hearing impaired patients due to VRI malfunctioning [DE 235-26, p. 13]; in both instances, pursuant to hospital policy, Kerr was required to obtain authorization for ordering an on-site interpreter from the "Administrator on Call" [DE 235-26, p. 18]. Other than these two incidents where VRI malfunctioning necessitated the use of on-site interpreters, Kerr was unaware of any complaints about VRI performance issues from patients or staff [DE 235-26, p. 19].

### 1.   Jacqueline Gluckman

Jacqueline Gluckman visited Bethesda Memorial on two occasions for tests to determine if she continued to have a staph infection in her shoulder arising from a surgery at another hospital. At the time of her visits, she was approximately seventy-three years of age and the parties agree she is disabled (deaf) within the terms of the ADA and Rehabilitation Act [DE 229, p. 4]. In addition to signing, Ms. Gluckman reads and writes "very well" [DE 229-13], and reads lips [De 229-12, p. 5]. She has visited doctors without the aid of an interpreter and one of her doctors noted "we wrote on a scratch pad to communicate which was working fine" [DE 229-17]. Ms. Gluckman is also comfortable using technology to communicate. For example, she uses a video phone through her television at home "all the time" [DE 229-13], and emails via an IPad and home computer [DE 229-12, p. 10].

On October 7, 2011, Ms. Gluckman visited Bethesda Memorial on an outpatient basis to have a fine needle aspiration of her left shoulder. This is a biopsy procedure in which a needle is inserted into an area of abnormal-appearing tissue or body fluid. The extracted fluid is then incubated to see if an infection grows. Commenting on the procedure, Ms. Gluckman described it as "just out-patient to draw blood to see if I still have MRSA" [DE 229-18]. She was familiar with the procedure because this was at least her third post-surgery aspiration [DE 229-10; DE 229-11].

Describing problems she encountered during the October 7th hospital visit, Ms. Gluckman stated that the VRI did not work "at all" that day and, as a result, she requested an on-site interpreter. The hospital declined and rescheduled the procedure for October 11th.

Ms. Gluckman returned to the hospital on October 11th and, after signing a consent form [DE 229-7], had the procedure on her left shoulder. Although the hospital's records do not identify Ms. Gluckman as being deaf, the VRI call log indicates that VRI was used with her for nearly seven minutes. Mr. Gluckman, however, asserts that the VRI picture was "blurry" and "no good" [DE 229-12, p. 9]. She claims that no one explained anything to her and "then they [] put the needle in my arm and it started bleeding" [*Id.*]. She later clarified this by stating she meant the hospital did not immediately inform her whether she still had the staph infection [*Id.*]. Despite her general complaint, Ms. Gluckman has not cited to any specific information she was unable to convey or understand.

Dr. Lane Deyoe, who performed the aspiration procedure, does not have an independent recollection of Ms. Gluckman but stated "I have performed various radiology procedures and services for deaf patients at Bethesda Memorial and I have never experienced a time when I could not effectively communicate with my patient" [DE 229-9].

Following her October 11th visit, Ms. Gluckman returned to Bethesda Memorial sixteen times for physical therapy [DE 229-18] and the hospital's records indicate that VRI was used twice during these sessions [DE 229-8]. She also returned to Bethesda Memorial for a number of mammograms when VRI was not used [DE 229-19]. Additionally, she had an MRI of the brain for which the VRI was used [DE 68-3]. She identifies no problems in communicating during these visits and they do not form part of the Third Amended Complaint.

Ms. Gluckman's suffers from a number of chronic ailments such as: sick sinus syndrome, coronary artery disease, atypical chest pain, hyperlipidemia, and hypertension [DE 229-2]. However, as of March 27, 2015, her cardiologist found her condition sufficiently stable that she was instructed to follow up in 3 months' time [DE 229-2]. Her primary care physician determined on June 26, 2015 that her health condition was generally stable and scheduled her to return on December 31, 2015 [DE 229-1]. When her primary care physician's deposition was taken on January 11, 2016, he concluded he was not treating her for anything that would require her in the near future to have to go to the hospital [DE 296-1, p. 10].

## 2. John Donofrio

John Donofrio was admitted to Bethesda Memorial for food poisoning on May 13, 2013. At the time of this visit, he was approximately seventy-one years of age, and the parties agree he is disabled (deaf) within the terms of the ADA and Rehabilitation Act [DE 231, p. 4]. By way of background, Mr. Donofrio attended a school focused on "lip reading and oral speaking" [DE 231-8, p. 3] and he is able to sign. He had a career working for newspapers like the Wall Street Journal and New York Post and he often reads magazines for leisure [*Id*. at p. 5]. He communicates via email and an application on his IPad [*Id*. at p. 6].

On May 13, 2013, after dining at a restaurant, Mr. Donofrio felt weak, dizzy, and nauseous and experienced vomiting. This caused him to go to Bethesda Memorial's emergency room where he received a CT scan, an EKG, blood tests and an IV for fluids [DE 231-9]. The VRI call log indicates VRI was used five times, for approximately a total of twenty-one minutes during the May 13th admission [DE 231-6]. A nurse noted Mr. Donofrio's deafness and concluded that he could communicate via VRI and written notes [DE 231-9]. The nurse also wrote "pt in bed, discussed plan o[f] care with pt and spouse with the use of the computer interpreter for the deaf, all questions answered, no new complaints…" [*Id.*]. Mr. Donofrio, however, asserts "[t]here was no VRI at all" [DE 231-8, p. 11]. At the same time, he has acknowledged that "My eyes were closed most of the time. I was so dizzy, my wife took care of all [communication]. I didn't even know what was going on." [*Id*. at p. 8]. His wife signed the consent for treatment [231-11] and discharge instructions on his behalf [DE 231-12].

As for his current health, Mr. Donofrio's primary care physician noted during his annual physical examination that he "feels good" [DE 231-1]. He was found to be in generally good health and was instructed on how to exercise and eat better. The doctor discussed the risks of smoking and instructed on how to treat his diabetes. Mr Donofrio was told to follow up in three months [*Id*.]. Mr. Donofrio suffers from a number of chronic health problems: general anxiety, hypertrophy of the prostate, diabetes mellitus, osteoarthrosis, hypertension, overweight, unspecified acquired hypothyroidism, unspecified diastolic heart failure, aortic valve disorder, chronic airway obstruction, and coronary atherosclerosis [DE 231-1]. In his response to the motion for summary judgement, Mr. Donofrio relies on a Dr. Sohsten's evaluation of Plaintiff Sandra Sunderland to conclude that coronary disease could lead him to go to the hospital at any time [DE 252, p. 7]. When his primary care physician's deposition was taken on January 20,

2016, he did not identify any acute conditions that could lead to hospitalization in the near future [DE 294-1]. In addition, Mr. Donofrio visits Bethesda Memorial as a companion to his wife with some frequency [*Id.* at. 15]

### 3.   Bodil Tvede

Bodil Tvede was was admitted to Bethesda Memorial on March 19, 2011 due to a stroke, and she remained there until March 22nd. She was eighty-one years of age at the time of this admission and the parties agree she is disabled (deaf) within the terms of the ADA and Rehabilitation Act [DE 237, p. 4].  By way of background, Ms. Tvede received a Bachelor of Science degree and, prior to retirement, worked as a school teacher and secretary, which involved typing [DE 237-1, pgs. 3-4]. Ms. Tvede reads and writes, and can sign and read lips [237-8; 237-9]. She uses a video phone and email to communicate with friends and family; plus she watches television with close captioning [DE 237-1, pgs. 5-6].

Ms. Tvede was brought by ambulance to Bethesda Memorial on March 19th , complaining that she could not move her arm or leg [DE 237-1, p. 7]. The hospital's record indicates that she was identified as deaf at the time of admission and communication was to be achieved by "Communication board, Pen & Paper, Lip Reading" [DE 237-5]. The record further indicates that she able to communicate during her hospital stay by reading lips, exchanging written notes and utilizing spoken words [DE 237-5, 237-6].

Ms. Tvede's claims focus on the alleged inadequacy of VRI to provide effective communication despite her ability to communicate by alternative means. Hospital records indicate that the VRI machine was in her room during her admission and she was given instructions on how to use it [DE 237-5]. The VRI, however,  was used only once on the first day for eleven minutes. Ms. Tvede asserts that VRI provided ineffective communication on this

occasion because the picture zoomed in too close on the interpreter, preventing her from seeing the interpreter's hands [DE 237-1, p. 8]. Her attending physician did not recall any specific communication problems with her [DE 237-11, pgs. 2-3]. The discharge notes indicate "[t]he patient had an uneventful hospital stay" [DE 237-12].

Ms. Tvede's Third Amended Complaint focuses exclusively on her March 19-22 admission and, therefore, the Court has limited its analysis to that event. Although Ms. Tvede once lived in Florida, she moved in May 2014 to Westerville, Ohio [DE 237-1]. As result of this move, she conceded she no longer has standing to seek injunctive relief under the ADA [DE 262 p. 5].

### B. Procedural History

In their operative Third Amended Complaint, Plaintiffs assert that Bethesda failed to provide interpreting services adequate to ensure effective communication with them during each of their respective hospital stays, and that this lack of effective communication violated their rights under Title III of the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.*, and section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794, by depriving them of an equal opportunity to participate in and enjoy the benefits of the hospital's services. Plaintiffs seek injunctive relief reforming Bethesda's policies and procedures, as well as compensatory damages, attorneys' fees and costs. In its current motions for summary judgment, Bethesda contends that Plaintiffs are unable to demonstrate entitlement to either form of relief.

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). An issue is "material" if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier

of fact to find for the non-moving party. *U.S. ex rel. Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1289 (11th Cir. 2014).

If the movant meets its initial burden under Rule 56 (c), the burden shifts to the nonmoving party to come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56 (e).  "[T]o survive summary judgment the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz*, 780 F.3d at 1050 (citing *Brooks v. Cty. Com'n of Jefferson Cty., Ala.,* 446 F.3d 1160, 1162 (11th Cir. 2006).

In ruling on a motion for summary judgment, the Court must construe the facts alleged in the light most favorable to the nonmoving party and resolve all reasonable doubts about the facts in favor of the non-movant. *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 337 (11th Cir. 2012). However, a court need not credit affidavit evidence which directly contradicts with earlier, sworn testimony of a party. That is, "[w]hen a party has given clear answers to unambiguous question which negates the existence of any genuine issue of material fact, that party cannot thereafter create such an in issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Thus, a district court may strike as sham an affidavit which contradicts testimony deposition when the party merely contradicts prior testimony without giving any valid explanation. *Id.* at 56.  In order to be stricken as a sham, however, an affidavit must be "inherently inconsistent."

### III. DISCUSSION

### A.  GOVERNING LAW: ELEMENTS OF CLAIM

Title III of the ADA applies to privately-operated public accommodations, including hospitals, and prohibits discrimination "on the basis of disability in the full and equal employment of goods, services, facilities, privilege, advantages or accommodations." 42 U.S.C. §12182 (a); 42 U.S.C. § 12181 (7) (f) (defining hospitals as public accommodations). Such discrimination includes:

> a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden …

*Id*. § 12182(b)(2)(A)(iii). A Department of Justice regulation implementing Title III further provides that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities." 28 C.F.R.§ 36.303 (c). A companion is defined as "a family member, friend, or associate of an individual seeking access to, or participating in, the goods services, facilities, privileges, advantages, or accommodations of a public accommodation, who along with such individual, is an appropriate person with whom the public accommodation should communicate." 28 C.F.R.§ 36.303 (c)(i).

Although Title III does not allow a private party to seek damages, it does provide for injunctive relief. 42 U.S.C. §12188 (b) (2); *Dudley v. Hannaford Bros. Co*., 333 F.3d 299, 304 (1st Cir. 2003): *Pickern v. Holiday Quality Foods, Inc*., 293 F.3d 1133, 1136 (9th Cir. 2002). To establish standing for such relief, a plaintiff must show that he or she will suffer an injury in fact which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L.Ed.2d

351 (1992). Past exposure to illegal conduct is not, in itself, sufficient to show that real and immediate threat of injury necessary to make out a case or controversy. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103, 105-106, 103 S. Ct. 1660, 75 L.Ed.2d 675 (1983).  Past wrongs can be considered, however, as evidence of an actual threat of repeated injury. *Henschen v. City of Houston, Tex.,* 959 F.2d 584 588 (5th Cir. 1992), citing *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S. Ct. 669, 38 L.Ed. 2d 674 (1974).

   Section 504 of the Rehabilitation Act, in turn, provides that "[n]o otherwise qualified individual with a disability in the United States… shall, solely by reasons of her or his disability, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity  receiving Federal financial assistance…" 21 U.S.C § 794 (a).

   ADA and Rehabilitation Act claims are governed by the same legal standards. *Cash v. Smith,* 231 F.3d 1301, 1305 (11th Cir. 2000). To prevail under either Act, the plaintiffs must prove (1) they are qualified individuals with a disability (2) who were excluded from participation  in or denied the benefits of Bethesda's hospital services programs or activities, or otherwise discriminated against (3) on account of their disability.  *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001).

   To recover compensatory damages under the Rehabilitation Act, a plaintiff must further show that the exclusion or denial was the result of intentional discrimination. *Liese v. Indian River Cty. Hosp. Dist.,* 701 F.3d 334, 344 (11th Cir. 2012); *Delano-Pyle v. Victoria Cty., Tex.,* 302 F.3d 567, 574 (5th Cir. 2002).  In this circuit, a "deliberate indifference" standard is applied to determine whether a hospital's failure to provide an appropriate auxiliary aid to a hearing-impaired patient was the result of intentional discrimination in violation of the Act; that is, discriminatory animus is not a required element of claim.  *Liese* at 347-48.

Further, for an organization, such as a hospital, to be liable for deliberate indifference to violation of a patient's rights under the Rehabilitation Act, a plaintiff must show deliberate indifference on the part of "an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the [organization's] behalf [and who] has *actual knowledge* of discrimination in the [organization's] programs and fails to adequately respond. *Liese* at 349 (emphasis in original), quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999, 141 L.Ed. 2d 27 (1998).

In this case, plaintiffs urge that every employee of Bethesda staff who knew of plaintiff's impairment and had the authority to ask for a live, on-site interpreter is an "official" within the meaning of *Liese.* However, such a broad approach in defining the contours of an "official" for attribution purposes under the Rehabilitation Act was considered and explicitly rejected by the Eleventh Circuit in *Liese* as one which "essentially eviscerates the requirement that there be a decision by an official." *Id.* at 350.  In *Liese*, the Court noted that "the purpose of the official' requirement is to ensure that an entity is only liable for the deliberate indifference of someone whose actions can fairly be said to represent the actions of the organization." *Id.* at 340, citing *Gebser,* 524 U.S. at 2909, 118 S. Ct. 1989, and that "the question of how far up the chain of command one must look to find an 'official' is necessarily a fact-intensive inquiry, since an official's role may vary from organization to organization." *Id.,* citing *Doe v. Sch. Bd. of Broward County, Fl.*, 604 F.3d 1248, 1255 (11th Cir. 2010).

Under current, binding Eleventh Circuit precedent, an "official" in this context is defined as "someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Liese* at 350, citing *Doe*, 604 F.3d at 1256-

13

57. "The 'key decision point' language reflects the practical reality that, while some decisions are technically subject to review by a higher authority, such a review is not part of the entity's ordinary decision making process." *Id*.

Reviewing the summary judgment record before it in *Liese*, the Eleventh Circuit ultimately concluded that there was a least a fact question as to whether the doctors at issue had complete discretion to decide whether to provide a patient with an interpretative aid. Accordingly, whether the doctors could be characterized as "officials" was an issue properly reserved for the jury. The Court recognized evidence suggesting any hospital staff member had authority to ask for an interpreter, or to retrieve VRI equipment from a storage closet, but focused only on the doctors as potential "officials" for attribution purposes because the evidence "suggest[ed] strongly that the doctors had supervisory authority" over the decision to order an interpreter, with ability to overrule a nurse's decision not to provide auxiliary aid.

## B. Application

### 1. Discrimination on the Basis of Disability

It is undisputed that all Plaintiffs in this case are qualified individuals with a disability. The threshold question presented on summary judgment is, therefore, whether there is a disputed issue of fact on question of whether Bethesda violated federal law by excluding Plaintiffs from, or denied them the benefits of, the hospital's services or programs by failing to provide live, on-site ASL interpreter services after plaintiffs expressed dissatisfaction with the efficacy of VRI services and a preference for live, on-site interpreters. If this is so, the inquiry appropriately turns to whether Plaintiffs are able to demonstrate a genuine issue of material fact pertaining to their entitlement to injunctive relief under the ADA or compensatory damages under the Rehabilitation Act.

On the threshold liability issue, Bethesda does not contest that the ADA and Rehabilitation Act require that it provide deaf and hearing-impaired patients with effective communication.  It argues, however, that the auxiliary aids and service necessary to ensure effective communication are context specific, 28 C.F.R. §36.303 (c) (1) (ii) (type of aid or service will vary with method of communication used by patient, nature length and complexity of the communication involved, and context in which the communication is taking place), and in this case there is no evidence that Bethesda failed to provide effective communication to any one of the three plaintiffs. Further, it urges the Court to infer the existence of effective communications by virtue of lack of evidence that any plaintiff was misdiagnosed, given the wrong medication, failed to understand or follow discharge instructions, or was otherwise harmed by a communication lapse with treating medical personnel.

The Court disagrees and rejects the proposition that lack of evidence of "adverse results" defeats any issue respecting the efficacy of communication. The statute and implementing regulations do not suggest an  "adverse action" element as necessary to state a cause of action, nor is there any statutory authority defining an "ineffective" communication as one which results in adverse medical consequence. To be "ineffective," the Court finds it sufficient that the patient experiences a real hindrance, because of his or her disability, which affects her ability to exchange material medical information with her health care providers.

Applying this standard, the Court finds that a genuine issue of fact exists as to whether Plaintiffs Jacqueline Gluckman, John Donofrio, and the Bodil Tvede were deprived of their right to "effective communication". More specifically questions of fact exists as to whether: (1) VRI consistently functioned and was suitable for each individual plaintiff; and if not (2) whether the intermittent   functioning   of   VRI,   combined   with   each   individual   plaintiff's   unique

communication abilities, such as reading lips or exchanging written notes, was sufficient to provide timely and effective communication, in light of the seriousness of the medical situation; and, if not, (3) whether the ineffective communication could have been cured by Bethesda retaining the services of an on-site interpreter.  No genuine issue of fact exists as to the suitability of VRI generally but rather its use in specific situations because, as plaintiffs' expert opined "VRI is a wonderful tool when used wisely and responsibly" [DE 52-2].

Plaintiffs Gluckman and Tvede acknowledge that VRI computer technology was used in an effort to provide ASL interpreting service during their admissions, but each complains it was not functioning properly, resulting in blurry images or the screen was too close and did not show the interpreters hands. They state they complained about these deficiencies but to no avail.  They contend they asked for a live, on-site ASL interpreter but these request were declined by the hospital's staff.

Plaintiff Donofrio's position with regard to VRI is less clear. The Third Amended Complaint states he "was not provided with a live interpreter or VRI during his stay at the hospital" [DE 217]. He reaffirmed this in his deposition stating "[t]here was no VRI at all" [DE 231-8, p. 11]. Defendants, however, contested this assertion by submitting the VRI call logs which indicated that VRI was used for Mr. Donofrio [DE 231-6]. In the response to the motion for summary judgment, Mr. Donofrio's counsel argued that  "[a]lthough the records show the communication methods as pen and paper and VRI, the VRI logs show only five very short calls made on the 13th of [five, six, three, three and one] minute which obviously reflect connection issues, and no call on the 14th…" [DE 252, p. 15]. Despite these problems, Mr. Donofrio, did not allege that he requested a live on-site interpreter.

As result of the foregoing the Plaintiffs allege they were unable to understand what was wrong with them or what was happening to them during their hospital stays, impeding their ability to meaningfully participate in the management of their own health care.

The Court recognizes that the Defendants are not required to provide ASL on-site interpreters as a matter of course in order to achieve "effective communication" with hearing- impaired patients, i.e., that there is no *per se* rule that qualified live, on-site ASL interpreters are necessary to comply with federal law. The Court also recognizes that while the governing regulations provide a public accommodation should consult with individuals with disability whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, the ultimate decision as to what measures to take rests with the public accommodation, provided the resulting communication is effective.  28 C.F.R. §36.303(c) (1) (ii).  *See also Feldman v. Pro Football, Inc.*, 419 Fed. Appx. 381, 392 (4th Cir. 2011). The auxiliary aid requirement is a flexible one, and "full and equal enjoyment" is does not necessarily mean "mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability." *Id.*; 45 C.F.R. § 84.52(d).

 In this case, however, there is evidence, sufficient to create a genuine issue of fact, that Bethesda's default reliance on VRI as an auxiliary aid resulted in patient comprehension failures – known to hospital staff -- and corresponding impediments to each patient's ability to meaningfully understand and participate in his or her own course of medical treatment.

Thus, assuming the existence of disputed issues of fact on the central liability question of whether Bethesda failed to provide auxiliary aids necessary to achieve "effective communication" by its hearing-impaired patients, the inquiry turns to the issue of whether the

plaintiffs can demonstrate entitlement to either form of relief demanded under Title III of the ADA or Section 504 of the Rehabilitation Act.

## 2. Entitlement to Relief under the ADA or Rehabilitation Act

### a. Injunctive Relief

A private party may seek only injunctive relief under Title III of the ADA, 42 U.S.C. § 12188(A)(1)(2012), while a plaintiff may seek injunctive relief and compensatory damages under Section 504 of the Rehabilitation Act upon showing of intentional discrimination. To show standing to seek injunctive relief, plaintiffs must show the existence of a "real and immediate" threat of future hospitalization at a Bethesda facility; in the context of the instant summary judgment proceedings, they must show the existence of disputed issues of fact bearing on this central question.

Upon careful review of the record, the Court finds this burden has not been met. Ms. Tvede had moved out of state and conceded she no longer has standing to seek injunctive relief. As for Plaintiffs Gluckman and Donofrio, there is no evidence of a "real and immediate" threat that they will return to Defendant's hospitals in the near future, nor is there any reliable evidence that VRI technology will malfunction in the future and that plaintiffs will not be provided with an alternative, adequate auxiliary aid in such an instance. Mr. Donofrio raises the secondary argument that his wife is also prone to going to Bethesda Memorial. As her regular companion, he claims this should be taken into consideration in determining whether a "real and immediate" threat exists that he will return to the hospital. The Court previously rejected Mrs. Donofrio's claim for injunctive relief under the ADA [DE 292], and it follows that Mr. Donofrio cannot rely on a companion claim for his wife to bolster his own claim that a "real and immediate" threat exists that he will return to Bethesda Memorial.

Plaintiffs advance the position that an elderly person suffering from a chronic, progressive medical condition necessarily demonstrates a "real and immediate" threat of future hospitalization which is sufficient to at least create an issue of fact on the question of standing to seek injunctive relief. In the absence of corroborating expert medical evidence regarding the likelihood an imminent future hospital admission, the Court disagrees. *McCullum v. Orlando Regional Healthcare System, Inc*., 768 F.3d 1135 (11th Cir. 2014) (no standing to seek injunctive relief where plaintiff failed   present evidence to support contention that allegedly chronic medical condition – ulcerative colitis - actually created a real and immediate threat that he would return to the defendants' facilities).

In addition to lack of evidence on the likelihood of an imminent future admission, plaintiffs do not show a likelihood of VRI malfunctioning at a Bethesda facility in the future, nor do they show that an interruption in VRI services, should it occur, would prevent effective communication in the future. Defendants have demonstrated they are willing to provide auxiliary aids, including in person, on-site ASL interpreters, where VRI malfunctions. Although the Court is not addressing the claims of co-plaintiff Ms. Donofrio in this current order, her case shows that the hospital will provide continuous on-site ASL interpreting services when the VRI machine malfunctions. Additionally, Defendants show that their existing policy calls for use of live, on-site interpreters if VRI is not adequate to ensure effective communication.

Because plaintiffs have not raised a genuine dispute of fact regarding the likelihood of future injury, the Court concludes they lack standing to seek injunctive relief, and shall accordingly enter summary judgment on all claims asserted under Title III of the ADA, as well as the claims asserted under Section 504 of the Rehabilitation Act insofar as they seek injunctive

relief.  *See McCullum v. Orlando Regional Healthcare System, Inc*., 768 F.3d 1135, 1145-46 (11th Cir. 2014).

### b.  Compensatory Damages

Bethesda further asserts that summary judgment is warranted under the Rehabilitation Act claims because no plaintiff is able to demonstrate the existence of disputed issues of fact on the question of whether the hospital intentionally discriminated against her within the meaning of the Act.  *Liese,* 701 F.3d at 343-44.  As discussed above, in order to present a jury question on this issue, a plaintiff must at least raise a genuine issue of material fact on the question of whether an "official" of the hospital, whose actions may properly be attributed to the organization, engaged in "intentional discrimination" her, i.e. the plaintiff must adduce some evidence suggesting that an "official" of the hospital was "deliberately indifferent" to a violation of her rights under the Act.  *Liese*, 701 F.3d at 345.

Deliberate indifference occurs when an individual knows that a violation is substantially likely and fails to act on that likelihood. *Id* at 344; *Doe v. Sch. Bd. of Broward Cnty., Florida*, 604 F.3d 1248, 1259 (11th Cir. 2010).  This involves an element of "deliberate choice," which is not met with evidence of mere negligence. *Liese*, 701 F.3d at 344. More specifically, a plaintiff must show the existence of disputed issues of fact on central question of whether an "official" of the hospital made a decision not to supply a live on-site interpreter, knowing that there was a substantial likelihood that the patient would not be able to communicate effectively without this auxiliary aid.  *McCullum*, 768 F.3d at 1147-48.

Plaintiffs contend that any hospital staff clinician who interacts with a patient is an "official" for purposes of this standard, contending that the Eleventh Circuit has somehow "retreated" from its holding in *Liese* requiring that deliberate indifference must be attributed to

"an official who at a minimum has authority to address the alleged discretion and to institute corrective measures" on the organization's behalf." In this regard, plaintiffs point to language in the Eleventh Circuit's more recent opinions in *McCullum* and *Martin v. Halifax Healthcare Systems, Inc.,* 621 Fed. Appx. 594 (11th Cir. 2015), where reference is made to the conduct of "hospital staff" in conjunction with the court's assessment of whether the evidence is susceptible to a finding of "deliberate indifference" on part of the defendant hospital. A close reading of *McCullum*, however, shows there is no support for the radical departure from the holding in *Liese* here advanced by plaintiffs.

Indeed, in *McCullum*, the Eleventh Circuit explicitly cites with approval to *Liese*'s requirement for evidence of decision-making by an "official" as a predicate for triggering organizational liability under the Rehabilitation Act. After describing the conduct of hospital "staff" at issue in that case, and finding no genuine issue of material fact on question of whether any staff person engaged in conduct which deprived plaintiffs of their right to equal treatment and "effective communication," the Court noted:

> To prevail on [plaintiff's] claims seeking damage from the hospitals, the patients must also show deliberate indifference on the part of "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the organization's behalf, and who has actual knowledge of discrimination in the organization's programs and fails to adequately respond." *See Liese*, 701 F.3d at 349 (alterations omitted); *see also Gebser v. Lago Vista Independ. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999, 141 L.Ed. 2d 27 (1998). Because we conclude that [plaintiff] has not presented sufficient evidence of deliberate indifference by a [hospital] staff member, we need not address whether the nurses and doctors treating him qualified as "officials" within the meaning of *Liese* and *Gebser*.

*McCullum* at 1149 n. 9.

In contrast, in this case the Court finds the existence of a disputed fact issue on the predicate liability question of whether Bethesda bedside nursing staff exhibited deliberate

indifference to the needs of the plaintiffs by failing to obtain live, on-site ASL interpreters at plaintiffs' request in the face of complaints about the efficacy of VRI technology as an auxiliary aid. Therefore, unlike the situation in *McCullum* or *Martin*, the Court in this case *does* need to address the issue of whether there is evidence that adverse decision-making regarding auxiliary aids can be attributed to a hospital "official" within the meaning of *Liese* and *Gebser.* Having addressed this inquiry, the Court concludes there is no evidence from which a reasonable jury could find that the Bethesda nursing staff who allegedly deprived plaintiffs of their right to effective communication qualified as "officials" in the *Liese* sense.

Plaintiffs contend that evidence showing any hospital employee who is a clinician taking care of a patient has the authority *to ask for* a live interpreter [DE 241, 67-8, 235-18] equates to a showing that any person who is a clinician taking care of a patient is an "official" of the hospital possessing sufficient discretionary authority to trigger organizational liability; thus, in this case, plaintiffs contend that evidence of the bedside nurses' failure to meet the plaintiffs' demands for on-site ASL interpreters is sufficient to raise a jury question on whether a  hospital "official" intentionally discriminated against them. It should be noted that Plaintiff John Donofrio does not assert that he requested an on-site interpreter.

The ability to *request* the provision of a certain auxiliary service or aid is not the equivalent of the discretionary ability to *order* such aid without pre-approval from another level of authority in the hospital administration's chain of command. Here, the undisputed evidence shows that only the hospital administrator on call and risk manager are persons at Bethesda vested with discretion to conclusively grant or deny a patient or staff member's request for on-site, live ASL interpreters as an auxiliary aide for a hearing-impaired patients or family members of such a patient.

There is no evidence that Ritson or any hospital administrator on call was ever contacted with a complaint about the functionality or efficacy of VRI services for any of the plaintiffs at issue in this case, nor is there any evidence, in general, that either category of hospital "official" ever refused a request for live, on-site ASL interpreting service when requested by a nursing supervisor, patient or hospital staff member. Indeed, the nursing supervisor, to whom all requests for VRI services are referred in ordinary course as a matter of standard operating hospital policy and procedure,  testified she was only aware of two instances where a patient or staff complained about the functioning of VRI, and in both instances she requested, and obtained authorization for, provision of an on-site interpreter.

Because there is no evidence that would allow a reasonable jury to conclude that the floor nurses or other staff members to whom requests for on-site interpreters were directed in the two cases (excluding John Donofrio) at issue had "complete discretion" at a "key decision point" in the administrative process to provide such assistance,  plaintiffs fail to demonstrate a threshold, disputed issue of material fact on the central liability question of whether a relevant hospital "official" acted in deliberate indifference to their federally protected rights under the ADA or the Rehabilitation Act. Accordingly, Defendants are entitled to entry of final summary judgment in their favor on all Rehabilitation Act claims.

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. Defendants' motion for summary judgment is **GRANTED** on all claims asserted under the ADA and Rehabilitation Act as to plaintiffs Jacqueline Gluckman, John Donofrio and Bodil Tvede.

2.  Pursuant to Rule 58, final summary judgment in favor of defendants shall be entered accordingly by separate order of the court.

3.  All pending motions are **DENIED as MOOT** as to the above-named plaintiffs.

4.  The trial and all corresponding pretrial deadlines are **CANCELLED** as pertaining to the above-named plaintiffs.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 11th day of May, 2016.

United States District Judge
Southern District of Flor